310 F.2d 872
 114 U.S.App.D.C. 67
 Mildred T. HANCOCK, Widow of Deceased Employee, Lewis L.
Hancock, etc., Appellant,
v.
Charles EINBINDER, Deputy Commissioner, Department of Labor,
Bureau of Employees' Compensation, District of
Columbia Compensation District, et al., Appellees.
 No. 16958.
 United States Court of Appeals District of Columbia Circuit.
 Argued Oct. 26, 1962.
Decided Nov. 15, 1962, Petition for Rehearing En Banc Denied
En Banc Jan. 7, 1963.
 
 Mr. Philip J. Lesser, Washington, D.C., with whom Mr. I. Irwin Bolotin, Washington, D.C., was on the brief, for appellant.
 Mr. George M. Lilly, Attorney, Department of Labor, of the bar of the Supreme Court of North Carolina, pre hac vice, by special leave of court, with whom Messrs. Charles Donahue, Solicitor, Department of Labor, Herbert P. Miller, Asst. Solicitor, Department of Labor, David C. Acheson, U.S. Atty., Charles T. Duncan, Principal Asst. U.S. Atty., and Nathan J. Paulson, Asst. U.S. Atty., at the time the brief was filed, were on the brief, for appellee Einbinder.
 Mr. Abbott A. Leban, Asst. U.S. Atty., at the time the record was filed, also entered an appearance for appellee Einbinder.
 Mr. James E. Murray, Washington, D.C., with whom Mr. Arthur J. Phelan, Washington, D.C., was on the brief, for appellee Liberty Mutual Ins. Co.
 Before WILBUR K. MILLER, FAHY and WRIGHT, Circuit Judges.
 WILBUR K. MILLER, Circuit Judge.
 
 
 1
 On April 4, 1959, Lewis L. Hancock was examined by a physician who diagnosed his ailment as angina pectoris. Nevertheless, he continued his work in the mailing department of a magazine publisher. Having worked a full week with some overtime, he reported at 4:00 p.m. Sunday, August 30, 1959, and continued work until about 1:30 a.m, August 31, when he collapsed. He died within an hour, as he was being taken to a hospital.
 
 
 2
 For herself and her minor child, his widow filed a claim for death benefits under the Longshoremen's and Harbor Workers' Compensation Act of March 4, 1927,[1] which has been made applicable to the District of Columbia.[2] After hearing evidence, the Deputy Commissioner rejected the claim because he found 'That the death of the employee did not result from injury arising out of and in the course of the employment or was it otherwise related thereto.' Mrs. Hancock sued in the United States District Court for the District of Coulumbia to review and set aside the order rejecting her claim. Cross-motions for summary judgment having been filed, Mrs. Hancock's motion was denied and the motions of the Deputy Commissioner and the insurance carrier were granted. She appeals.
 
 
 3
 The parties agree that the question presented is whether the record, considered as a whole, supports the Deputy Commissioner's finding that Hancock's death did not result from an injury which arose out of and in the course of his employment and was not otherwise related thereto.
 
 
 4
 The compensation order's findings contain the following:
 
 
 5
 '* * * That between 12 o'clock midnight, August 30, 1959, and approximately 1:30 A.M., on August 31, 1959, the employee wrapped and tied bundles of magazines weighing from one pound to approximately thirty pounds; that during the overtime tour of duty, as found above, he did not require the assistance of co-workers in the performance of his duties and did not say anything about adverse working conditions; that he never talked with his employer about getting another job; that he never complained to the employer of any difficulty with his chest or with his breathing as a result of the work he performed, as found above;
 
 
 6
 'That at approximately 1:30 A.M., on August 31, 1959, the employee, while working on the conveyor belt and sorting magazines, asked that the conveyor machine be stopped, and thereafter he sat on the belt and collapsed; that he was pronounced dead on arrival at a hospital at 2:30 A.M., on August 31, 1959; that the employee was not subjected to heavy physical strain or unusual exertion during the period, as found above; that the conveyor machine was not operationg too fast; that the employee at the time of his death was performing duties consistent with the normal part of his job; that the cause of death of the employee was acute congestive heart failure * * *.'There was testimony tending to support these findings. In addition, however, there was testimony tending to show that, when wrapping and tying the magazines into bundles or 'squares' weighing from 30 to 40 pounds, Hancock placed them in mail sacks, which weighed 80 pounds when full, and then dragged the sacks some 25 feet to a loading platform. For example, John Troha, a fellow worker, testified thus:
 
 
 7
 'Q. And would you explain this-- you explained these various jobs that you work on, and this wrapping squares, would you tell us what this wrapping squares consisted of? * * * A. Each square weighs about 30 pounds.
 
 
 8
 'Q. What is the maximum weight of a square, do you know, has anyone ever told you? A. No, but each bag when the bag is dragged shouldn't be over 80-- it shouldn't be over 80 pounds.
 
 
 9
 'Q. It shouldn't be over 80 pounds? A. Yes, sir.
 
 
 10
 'Q. Now, after he completed wrapping the squares on this particular night just before his collapse, you said that he had been working on another job for about eight or nine minutes? A. Yes, sir, with me, running the machine, that is right.
 
 
 11
 'Q. And then he-- I think you testified that he asked you to turn the machine off? A. Yes, he did.
 
 
 12
 'Q. What was his appearance at that time? What did he say, do you recall? A. He asked me as I had explained, he asked me if I would shut off the machine, which I did. And then, like I mentioned, he sat down on the belt, he wanted air is what he claimed, and then he fell off.
 
 
 13
 'Q. And he fell off? A. Yes.
 
 
 14
 'Q. You mean he fell off, was he unconscious? A. Yes, blue in color, shaking and everything.
 
 
 15
 'Q. I just wanted to straighten one last question here now. So, he had been wrapping these squares and then he had changed jobs and he was working on this machine for eight or nine minutes? A. That is right.
 
 
 16
 'Q. When he asked you to cut the machine off? A. That is right.'
 
 
 17
 Another witness, Robert Amos, said with respect to this:
 
 
 18
 'The Deputy Commissioner: I mean, did you actually see him do any of these things? Did he drag any bags with these magazines out to the platform before he collapsed?
 
 
 19
 'The Witness: If he was on the tying machine he would have, that is right.
 
 
 20
 'The Deputy Commissioner: Did you see him?
 
 
 21
 'The Witness: I don't pay that much attention. I am working right there with him, if he did I couldn't have missed seeing him.
 
 
 22
 'The Deputy Commissioner: No, did you see him?
 
 
 23
 'The Witness: I would say, yes.
 
 
 24
 'The Deputy Commissioner: Are you positive that you saw him drag these bags, how many did you see him drag out to the platform?
 
 
 25
 'The Witness: it is a process of half an hour, you drag quite a few of them out there.
 
 
 26
 'The Deputy Commissioner: Can you testify under oath that you saw him drag one out to the platform?
 
 
 27
 'The Witness: I don't see how he would have gotten around it; I don't sit and watch every man drag them out.
 
 
 28
 'The Deputy Commissioner: Well, Mr. Amos, I just want you to tell me what you saw. I am here to get all the facts in this claim for death benefits filed by Mrs. Hancock. I want to know-- you can take all the time you want to try to remember, did you see Mr. Hancock after he dropped these ties of magazines which he carried over to the edge of the table about two or three feet and dropped it into a sack which was attached to the edge of the table by virtue of being hooked onto some hooks. Did you see him drag any of these filled sacks which you testified may have weighed 75 or 80 pounds, over 25 feet to the platform? Did you actually see him drag any?
 
 
 29
 'The Witness: That has been two years ago. I don't see how he could have got around not dragging them out there. I will put it that way, it is something that is unavoidable.
 
 
 30
 'The Deputy Commissioner: Did you see him drag any, I want your best recollection.
 
 
 31
 'The Witness: I would say, no, I couldn't.
 
 
 32
 'Mr. Overton: He said to the best of your recollection.
 
 
 33
 'The Witness: He couldn't avoid it, I would say, yes.'
 
 
 34
 These witnesses, who were testifying two years after the event, could not recall actually having seen Hancock drag 80-pound mail sacks across the floor shortly before he was stricken, but they knew he was then performing an operation which necessarily required him to drag the heavy sacks to the loading platform. The operation could not be completed without dragging the sacks; as one witness said, 'It is something that is unavoidable.' There was no evidence to the contrary; indeed the Deputy Commissioner found Hancock was performing his normal duties at the time in question, and these witnesses said dragging the mail sacks was one of those duties. In those circumstances it was a mere quibble for the Deputy Commissioner to press the witnesses as to whether they actually saw Hancock drag 80-pound mail sacks across the floor a few minutes before his collapse. We said in Friend v. Britton:[3]
 
 
 35
 '* * * Our review must also take account of the settled rule that the Act is to be construed with a view to its beneficient purposes. Doubts, including the factual, are to be resolved in favor of the employee or his dependent family. * * *'
 
 
 36
 We hold that the record sufficiently indicated, without contradiction, that Hancock had dragged 80-pound sacks a short time before his death. That this was of critical importance appears from the fact that the employer's medical expert who had said, in answer to a hypothetical question, that the injury did not arise out of or in the course of the employment, expressed the opposite opinion on cross-examination when the factor of dragging 80-pound sacks was added to the hypothetical question. Mrs. Hancock's two medical witnesses said the death arose out of the employment. One said there was a 'definite relationship' between the employee's work effort and his death, and that the 'work effort involved undoubtedly brought on his death.' The other stated that in his opinion the employee's death was related to his work on that occasion.
 
 
 37
 We conclude that the Deputy Commissioner's finding of fact as to the work Hancock had done just prior to his death was shown by the whole record to be inaccurate in that it failed to include his handling of the heavy mail bags very soon before his collapse. We further conclude that the medical evidence considered as a whole furnishes no basis whatever for the Deputy Commissioner's finding 'that the acute congestive heart failure which caused the employee's death * * * did not arise out of and in the course of the employment or was it otherwise related thereto.' The testimony of the three medical experts was exactly to the contrary.
 
 
 38
 As we have said, Hancock was suffering from angina pectoris, which had been diagnosed about four months before he died. His death, which the experts were unanimous in saying arose out of or in the course of his employment, was due to an 'accidental injury' within the meaning of the statute. Hoage v. Royal Indemnity Co., 67 App.D.C. 142, 90 F.2d 387 (1967).
 
 
 39
 The Deputy Commissioner's questioning of witnesses and certain passages in his compensation order emphasized the fact 'that the employee at the time of his death was performing duties consistent with the normal part of his job.' If his ultimate decision was based on the notion that an injury is not compensable unless it resulted from the performance of unusual work, he was mistaken. We said in Commercial Casualty Ins. Co. v. Hoage, 64 App.D.C. 158, 159, 75 F.2d 677, 678 (1935):
 
 
 40
 '* * * It has been held a number of times, and we think correctly, that an accidental injury may occur notwithstanding the injured is then engaged in his unsual and ordinary work * * *. It is enough if something unexpectedly goes wrong within the human frame. * * *'
 
 
 41
 The statute provides that 'It shall be presumed, in the absence of substantial evidence to the contrary-- (a) That the claim comes within the provisions of (this Act).' 44 Stat.1436, 33 U.S.C. 920. We said in Robinson v. Bradshaw, 92 U.S.App.D.C. 216, 219, 206 F.2d 435, 438, cert. denied 346 U.S. 899, 74 S.Ct. 226, 98 L.Ed. 400 (1953):
 
 
 42
 'It is held, as we have seen, that when death in the course of employment results from an aggravation caused by the employment, of a preexisting illness, it is compensable under the statute. We think it follows that the statutory presumption brings the death within the Act when it results in the course of employment from an illness which has taken a sudden and unusual turn for the worse, not shown by substantial evidence to be unrelated to the employment.'
 
 
 43
 As the Deputy Commissioner's rejection of Mrs. Hancock's claim is not supported by the record, the District Court erred in entering summary judgment in his favor and in favor of the insurance company. Mrs. Hancock's motion therefor should have been granted.
 
 
 44
 Reversed and remanded.
 
 
 
 [1]
 44 Stat. 1424, 33 U.S.C. 901 et seq
 
 
 [2]
 45 Stat. 600, 36-501, D.C.Code (1961)
 
 
 [3]
 95 U.S.App.D.C. 139, 141, 220 F.2d 820, 821 (1955)