HOAGE, Deputy Com'r, et al. v. ROYAL INDEMNITY CO. et al.

No. 6687.

United States Court of Appeals for the District of Columbia.

Decided April 5, 1937.

Rehearing Denied June 17, 1937.

Leslie C. Garnett, U. S. Atty., District of Columbia, Allen J. Krouse, Asst. U. S. Atty., District of Columbia, James E. McCabe, Z. Lewis Dalby, and W. E. Boote, all of Washington, D. C., for appellants.

Frederic N. Towers, Norman B. Frost, Frank H. Myers, all of Washington, D. C., for appellees.

Before MARTIN, Chief Justice, and VAN ORSDEL and GRONER, Associate Justices.

MARTIN, Chief Justice.

This is an appeal from a decree of the lower court vacating an award of workmen's compensation granted to James S. Rennie by the Deputy Commissioner of Compensation under the provisions of the compensation law of the District of Columbia—Longshoremen's and Harbor Workers' Compensation Act (U.S.C.A. title 33, c. 18, §§ 901–950), as made applicable in the District of Columbia by the Act of May 17, 1928 (D.C.Code, title 19, c. 2, §§ 11, 12 and 33 U.S.C.A. § 901 note). The testimony heard by the Deputy Commissioner appears in the record.

It appears that James S. Rennie was first employed by appellee Royal Indemnity Company in May, 1932, as a claims adjuster, which position involved investigations of accidents and the settlement of claims. During the early part of 1933, the claims handled by Rennie increased materially so that he was required to stay late at the office and frequently to work evenings at his

home in Baltimore. He did not, however, ask assistance from his employer. He began to worry when getting behind with his work and for nine months suffered from fatigue, headaches, insomnia, and heartburn. On April 28, 1934, he suffered a heart attack requiring him to seek medical assistance. Thereafter he continued with his usual duties, against the advice of his physician, until the morning of May 5, 1934, when, while sitting at his desk using the telephone he suffered another heart attack similar to the previous one but of greater severity. Opiates were administered and he was taken to the hospital, where he remained until June 1, 1934. Since that date he has been away from his employment, and in the opinion of his attending physician is totally incapacitated for any arduous labor. On March 7, 1935, he filed a formal claim for compensation and medical benefits. Prior to that time, however, he had not given either to his employer or to the Deputy Commissioner a formal notice of his claim.

At the hearing before the Deputy Commissioner the basis of Rennie's claim was stated to be overwork and worry for nine months or more culminating in disability on May 5, 1934. The appellees defended on the ground that he had not suffered from an "accidental injury" within the meaning of section 2 of the Compensation Act, 33 U.S.C.A. § 902; and also that notice of his claim had not been given in accordance with section 12 of the Act (33 U. S.C.A. § 912).

The Deputy Commissioner awarded compensation to Rennie. Whereupon the appellees brought suit in the lower court to vacate the award. Their bill was sustained by that court, and the present appeal was then taken.

In the compensation order entered by the Deputy Commissioner the following statements of fact are reported as his findings upon the evidence:

"That on the 5th day of May 1934 James S. Rennie, the claimant herein, was in the employ of the employer above named * * * ; that on the said date the claimant herein while in the employ of the employer above named as a claim adjuster suffered an attack of angina pectoris resulting in his total disability and that said disability has been continuous and still exists; that for about nine months prior to May 5, 1934, the claimant herein had been suffering from frequent violent headaches, fatigue, insomnia, and heartburn; that due to the increased amount of work that was given to the claimant to do prior to this date, the claimant was compelled to take work home nights and to work overtime in the office, and in spite of the extra time he was compelled to put in by reason of the extra amount of work loaded upon him, he was unable to handle the said work properly; that the said working conditions caused the claimant to suffer from nervous strain and fatigue; that by reason of the extra amount of work he was compelled to do and the nervous strain suffered by reason thereof the claimant sustained an injury which arose out of and occurred in the course of his employment and resulted in his disability within the meaning of the Act; that the claimant was suffering from a preexisting disease known as arteriosclerosis; that the arteriosclerosis which was preexistent formed the basis for the angina pectoris; and that the angina pectoris was naturally followed by coronary thrombosis, and that the attack or angina which occurred April 28, and May 5, 1934, and was followed by the coronary thrombosis of May 5, was precipitated by overwork and emotional strain resulting from the large amount of work the claimant was called upon to do as described above; that the insurance carrier objected to the payment of compensation on the ground that the claimant had not given notice as provided in section 12 of the Act.

"It is found that the employer had knowledge of the overwork the claimant was compelled to do, and that the claimant was in need of assistance in his office to carry on his work; that the employer also had knowledge within thirty days of the fact that the claimant suffered a collapse on May 5, 1934; that the employer had every privilege of determining the merits of the case at the time, and it is found that the rights of the employer had not been prejudiced by reason of the failure of the claimant to make a formal report within thirty days from the date of his collapse, as provided in section 12 of the Act; that the claimant therefore is excused on the ground that at the time of his collapse, he did not know the seriousness of his condition, and the facts of the relation between his occupation and his condition was not made known to the claimant immediately. * * *"

On these facts the Deputy Commissioner based his findings that the injury was compensable and made the award in question.

In the bill for an injunction filed by the appellees in the lower court it is averred among other things that the Deputy Commissioner erred in finding that the disability sustained by the claimant was the result of accidental injury within the meaning of section 2 of the act; and that the findings excusing the claimant from filing claim within thirty days as required by section 12 of the act are erroneous in law and in fact.

The lower court held that the compensation award embodied in the order of the Deputy Commissioner was "not in accordance with law" and accordingly decreed that the order and award be set aside and that the defendants be enjoined from enforcing the same.

The first question arising in the case is whether the employee, Rennie, sustained an accidental injury within the meaning of section 2 of the District of Columbia Workmen's Compensation Act which reads in part as follows:

"Sec. 2. When used in this Act [chapter] * * * (2) The term 'injury' means accidental injury or death arising out of and in the course of employment, and such occupational disease or infection as arises naturally out of such employment or as naturally or unavoidably results from such accidental injury, and includes an injury caused by the willful act of a third person directed against an employee because of his employment."

■ It is conceded that under the law applicable to this case the facts found by the Deputy Commissioner may not be disturbed upon appeal where there is any competent evidence to support them, but the court may deny effect to such findings if they are without evidence or contrary to the indisputable character of the evidence. Crowell v. Benson, 285 U.S. 22, 46, 52 S. Ct. 285, 290, 76 L.Ed. 598.

■■ The record contains testimony tending to show that Rennie was forty-eight years of age at the time of his collapse, and had started work for the Royal Indemnity Company in May, 1932, having been placed in charge of the claims adjustment department in Washington, which constituted several offices; at that time the cases of the office ran from about 100 to

110 a month, which it was not hard for him to handle; thereafter, however, other adjustment work was undertaken and the number of cases referred to him increased steadily as the business grew; the cases assigned to him finally increased from about 100 a month to about 250 a month at the time he made his last report prior to his collapse from overwork; during this period of increasing work no help was given to Mr. Rennie other than some help given about October, 1933, on certain damage claims; Rennie was reported to the home office on "twenty occasions" for not settling claims soon enough; his work continued to get behind notwithstanding long continued overwork practically every night in the week. It was testified, and not disputed, that a claim adjuster handling his work properly can handle only from about 75 to 100 cases a month, but in the present instance the cases mounted steadily until at the time of his collapse Rennie was handling more than 250 cases a month being a great many in excess of claim adjuster's monthly capacity.

Mr. Rennie's hours of employment were as a usual matter from quarter to 9 every morning except Sunday until 5:30 or 6 o'clock p. m., and thereafter he usually worked upon his cases at the office until 10 o'clock p. m., or worked on the cases at home after leaving the office. On Saturday he generally worked until 3 or 4 o'clock in the afternoon and he frequently worked on Sunday. The extensive overwork began between eight and nine months prior to his collapse and the physical results became manifest by frequent violent headaches, heartburn, tired condition, and worry due to failure to keep his work up to date. He did not sleep well; he testified that he went to bed about 11:30 or 12 o'clock p. m., and that he would awaken about 5 o'clock in the morning with a headache and was unable to sleep thereafter. The complaints and telephone calls from the home office, as well as visits by representatives of the employer, were a source of great worry to him. He was told by his physician about a week before he collapsed, that he would have "to slow up," and as a consequence of this advice he immediately wrote to his home office and requested his vacation time to be advanced so that he might rest. A week later he collapsed, during his working hours, at about 11:30 on Saturday, May 5. At the time of his collapse he stated that "everything turned black, and

I had terrible pains in my chest." Mr. Rennie was removed immediately to a hospital; and he has since been unable to work and no doubt suffers permanent total disability and will continue to suffer such disability. At the hearing Mr. Rennie testified that 'at that time the employer had three men doing the work he formerly was required to do.

The record contains the testimony of Dr. L. T. Gager, who specializes in internal medicine and cardiology, and who had examined Mr. Rennie a week before the final attack of angina pectoris and who had treated Mr. Rennie since his attack on May 5, 1934. He testified that: "My opinion is that excessive work and strain induced a premature change in his coronary arterial system. That is my personal opinion, and it is the experience of a good many men who are students of the heart." He further testified that overwork, worry, and emotional strain produced a spasm in a susceptible coronary artery and resulted in the disturbance of the vasomotor system bringing about angina pectoris; that Mr. Rennie is totally disabled; that the overwork and worry were the precipitating factors which brought about the collapse.

Dr. Courtney testified that he had examined Rennie before the attack of May 5, 1934, and that the angina pectoris was brought on by the conditions of his employment.

We think that the testimony in the record fully considered tends to show that Mr. Rennie by reason of mental strain, worry, and long and excessive hours of labor suffered a collapse which resulted in his total disability as found by the Deputy Commissioner. We think this collapse constituted an accidental injury within the purview of the statute. His case is comparable to that of a manual laborer whose heart collapses as a result of long continued physical strain or overwork resulting from excessive exertion. Such a case was considered by this court in Commercial Casualty Ins. Co. v. Hoage, 64 App.D.C. 158, 75 F.(2d) 677, 678, in which the collapse was caused through continued use of the muscles by lifting. In that case it appeared that a grocery store clerk who was unaware of having an enlarged heart, suffered aoritic regurgitation which was precipitated by strenuous exertion in handling sacks of potatoes, and which condition in turn caused death. We held that these facts sustained a finding of the Deputy Commissioner that the clerk sustained compensable "accidental injury" under the act. In that case we said:

"In view of all this, we cannot say there is no evidence to sustain the award. It has been held a number of times, and we think correctly, that an accidental injury may occur notwithstanding the injured is then engaged in his usual and ordinary work, and likewise that the injury need not be external. It is enough if something unexpectedly goes wrong within the human frame. And so, an award of damages has been sustained in a case in which injured was lifting a weight resulting in the breaking of a blood vessel, or the straining of a muscle, or in hernia. Hence it is that 'accidental injury' includes any injury which is unexpected or not designed, and just as much includes injury sustained by an employee subject to physical infirmities as injury to one who is strong and robust."

In the case of Hoage v. Employers' Liability Assur. Corporation, 62 App.D.C. 77, 64 F.(2d) 715, 718, the employee was employed by Southern Dairies at its plant in the district. It was his duty to record temperatures, repair pipes, and perform other services in the cooling rooms of the plant. The rooms were used for hardening ice cream and were maintained at temperatures ranging from zero degrees F. to 22 degrees below zero F. His duty was to observe the temperature in these rooms each two hours and to record it in a log book. There were seven of these rooms and the inspection and recording of the temperature occupied on each inspection from 15 to 20 minutes. On the day in question, which was the 4th of December, 1930, insured, on returning to the engine room, noticed a peculiar numbness in his right foot. A similar numbness on previous occasions had been overcome after a little while by stamping his feet. On the 4th day of December, however, he was unable to renew circulation in the usual manner, and the resulting condition continued and grew worse and the numbness extended throughout his foot with gradually increasing symptoms. Notwithstanding, he continued to perform his duties as usual, but on December 9th and again on December 11th he consulted his family physician and later, on December 26th, a blood specialist; "that it was found that the claimant * * * was suffering from thrombo-angitis obliterans, and was possibly complicated by arteriosclerosis;" that the claim-

ant continued at his work until January 3, 1931, when he was compelled to relinquish his employment because of the condition of his right leg, which was found to be interference with the blood circulation in the foot. It subsequently became necessary to amputate the right leg above the knee. It was found by the Deputy Commissioner that the employment of the workman in the cold chambers of the refrigerator had aggravated a pre-existing condition of arteriosclerosis and the gangrene and amputation of the claimant's right leg were approximately caused by the condition of his employment. We held that "the compensation statute does not require that there should be an unusual or extraordinary condition existing at the time of the injury or incident to it, and so the fact that other workmen may have gone into these refrigerating rooms without injury does not affect the question." And that, "In other words, on account of the diseased condition of the blood vessels, the frequent, daily exposure to the intense cold, culminating in the work of December 4th, had set in motion a chain of circumstances resulting ultimately in the amputation of the leg. We think this was an unlooked for event and was therefore an accident * * * of that nature described by Lord Loreburn in Clover, Clayton & Co. v. Hughes, [1910] L.R.App.Cas., page 242, where he said: 'An accident arises out of the employment when the required exertion producing the accident is too great for the man undertaking the work, whatever the degree of exertion or condition of health.'" See, also, Ætna Life Ins. Co. v. Hoage, 62 App. D.C. 6, 63 F.(2d) 818.

In Thompson v. City of Binghamton, 218 App.Div. 451, 218 N.Y.S. 355, the death of a janitor resulting from acute dilation of the heart, weakened by chronic myocarditis, and caused by excitement and exertion of answering a false fire alarm at the schoolhouse, held compensable as an "accidental injury" notwithstanding the absence of a tramatic injury.

In Pickerell v. Schumacher, 215 App. Div. 745, 212 N.Y.S. 899, affirmed 242 N.Y. 577, 152 N.E. 434, it appeared that the claimant was driving a hearse up a grade. He applied his emergency brake to stop the hearse, but the brake failed to hold, and the hearse started to back down the hill. Claimant turned the steering wheel, and, after going back about 20 feet, the hearse ran against a bank at the side of the road where it stopped without further mishap. Claimant suffered a cerebral apoplexy the following morning. There was no physical injury to him, other than the excitement. The claimant did not suffer any traumatic injury or physical strain. It was an accident that the brake failed to hold, but not an accident to him. The only accident to him was the mental nervous excitement due to the failure of the brake and the consequent backing down hill of the hearse, and the apoplectic stroke did not occur until the following morning.

In Klein v. Darling Co., 217 Mich. 485, 187 N.W. 400, it was held that death due to mental shock from having accidentally killed a fellow employee was caused by an accident arising out of the employment although there was not external physical injury to the deceased.

In the present case we are convinced that the claimant suffered a severe spasm of the heart muscle which occurred on May 5, 1934, caused by angina pectoris and that this was the consequence of overwork and physical and mental strain required of the employee by the employer, and resulted in coronary thrombosis, and that this sequence brought the case within the act. It is well known that nervous shock, continued anxiety, and excessive exertion at work under trying circumstances may contribute toward the collapse of persons who are already suffering from hardening of the arteries.

In respect to the second claim of the appellees, i. e., that the claimant failed to file a claim within 30 days as required by section 12 of the act, we need do no more than refer again to the case of Hoage v. Employers' Liability Assurance Corp., supra, in which case we passed upon a similar statement of facts and held that the claimant's failure to file a written notice of injury within 30 days was lawfully excused by the Deputy Commissioner.

Upon the entire record we conclude that the decree of the lower court should be, and it is hereby, reversed, and the cause is remanded for further proceedings consistent herewith.

Reversed.