Marjorie P. JONES, Petitioner,

v.

DISTRICT OF COLUMBIA DEPART-
MENT OF EMPLOYMENT
SERVICES, Respondent,

and

Potomac Electric Power
Company, Intervenor.

No. 84–1675.

District of Columbia Court of Appeals.

Argued Dec. 18, 1985.
Decided Jan. 14, 1987.

dicts our ruling in *Washington Metropolitan Area Transit Authority v. District of Columbia Department of Employment Services,* 506 A.2d 1127, 1128, 1129 (D.C. 1986) (per curiam) (*WMATA*). We therefore must reverse and remand.

Robin D. Kardon, Washington, D.C., for petitioner.

Edward E. Schwab, Asst. Corp. Counsel, with whom Inez Smith Reid, Corp. Counsel at the time the briefs were filed, John H. Suda, Principal Deputy Corp. Counsel at the time the briefs were filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on brief, for respondent.

John J. Sullivan, Washington, D.C., for intervenor.

Before NEBEKER, FERREN and TERRY, Associate Judges.

FERREN, Associate Judge:

Petitioner's husband, William H. Jones, died on the fourth day of a five-day suspension from work, the day before he was to attend a hearing to determine whether he would be fired after 35 years of employment as a heavy equipment operator with intervenor, Potomac Electric Power Company (PEPCO). A hearing examiner concluded that the emotional stress resulting from the suspension and potential discharge had caused Mr. Jones' fatal heart attack and, accordingly, awarded death benefits. Upon review, however, the Director of the Department of Employment Services (DOES) concluded that Mr. Jones' death was not an "accidental injury" because disciplinary actions are not unusual events giving rise to employer liability. We conclude, to the contrary, that the Director's construction of "accidental injury" contra-

I.

On December 8, 1982, petitioner, Marjorie P. Jones, came home from work to find her 58-year-old husband lying in their marital bed, dead. A week earlier, on November 30, 1982, Mr. Jones' supervisor had seen Jones holding a wet paper bag containing a bottle that smelled of whiskey. Jones had refused to submit a blood or urine sample to test for alcohol content. He therefore had been suspended for the rest of the day but had returned on December 1 and worked the full day.

When Jones arrived at work on December 2, he was summoned to attend a "hearing" with PEPCO and union officials. At that time, no testimony was presented; PEPCO officials simply told Jones of the charges against him and informed him that a chemical analysis of the contents of the bottle had revealed it contained 80 proof alcohol. PEPCO presented him with a pink slip suspending him for five days.[1] Jones was further informed of his rights under the union contract, including the right to a hearing at which he could present his case. *Supra* note 1. A hearing date was set for December 9, the last day of the five day suspension. Jones then went home.

The hearing examiner credited Mrs. Jones' testimony that during the next five days, December 3–7, her husband's behavior changed dramatically. He went upstairs to bed and stayed there. He neither ate nor bathed. When he did eat some toast on the third day, he vomited. He was withdrawn and irritable. He showed no

---

1. The suspension notice stated, in pertinent part:

[I]t has been determined that you shall be suspended for a period of five (5) days, December 3, 6, 7, 8 and 9, 1982, under the provisions of Article 16 of the Labor Agreement. During this five-day period, the Com-

pany shall determine whether to convert your suspension into a discharge, or whether to extend, reduce, sustain, or revoke the suspension. Also, during this period, you have the right to request a hearing before your Group Head or his designated representative.

interest in, and was short tempered with, his wife and family. This was drastically different from his normal family life.

On December 8, the day before his scheduled hearing, Mr. Jones got up in the morning for the first time since he had been suspended and saw his wife off to work. Apparently he went back to bed, because when Mrs. Jones went home after a frantic call from her daughter, she found her husband there, dead. The death certificate indicated the cause of death was "occlusive coronary arteriosclerosis," although no autopsy was performed.

At the hearing on the application for death benefits, Mrs. Jones and PEPCO each presented two experts through live or deposition testimony. For petitioner, Drs. Richard Schwartz and Jack Segal testified that during his suspension Mr. Jones had been under acute emotional stress, anxiety, and depression from the continuous and immediate threat of losing his job. Such stress causes an unusual buildup of adrenaline and epinephrine, which stimulates heart rate and irregular heart beats and precipitates sudden cardiac arrest. Consequently, these doctors concluded that the emotional stress from the threat of losing his job had caused Mr. Jones' death.

To the contrary, Drs. Stewart Seides and John Russo testified for PEPCO that, in their opinions, the events of November 30 and December 2 were not causally related to Jones' death on December 8. They based their opinions in part on Mr. Jones' history of hypertension and arteriosclerosis and on the length of time between the day Jones was suspended and the day of his death.[2]

## II.

The hearing examiner identified the "only issue" as whether Mr. Jones' "death arose out of and in the course of employment." The examiner found petitioner's experts more persuasive and thus found

that petitioner had "established a causal relationship between [Mr. Jones'] death and stress caused by the threat of losing his job of 35 years." Accordingly, the examiner concluded that Jones' "death arose out of his employment."

The hearing examiner rejected PEPCO's arguments that, because Mr. Jones' death arose out of an accusation of possessing liquor, it was attributable to an incident outside the course of his employment and, in any event, that the claim should be barred by public policy. The examiner acknowledged that D.C. Code § 36–303(d) (1981) expresses this jurisdiction's policy that injury occasioned solely by intoxication is excluded from coverage, but he found this provision inapplicable because there was "no evidence that [Mr. Jones'] death was caused solely by intoxication. I have found that the medical evidence establishes that [his] death was caused by work-related stress." The hearing examiner recommended awarding petitioner and her dependent children death benefits at the rate of 66⅔ per cent of Mr. Jones' average weekly wage plus $1,000 for reasonable funeral expenses.

Upon initial review, the Director proposed to adopt the hearing examiner's recommended order. After consideration of PEPCO's exceptions and petitioner's response, however, the Director reversed his position. Citing 1B A. Larson, THE LAW OF WORKMEN'S COMPENSATION § 38.65 (1986), the Director concluded that the issue was not causation, *i.e.*, whether the injury " 'arose out of' " and " 'in the course of' " employment, but rather whether the injury was an " 'accidental injury.' " The Director explained that while emotional stress, resulting from "unexpected or unusual events," "can be readily identified as having arisen by accident," emotional reaction to an event that is "not unexpected or unusual in the workplace" may not be characterized as an accidental injury. The Di-

2. Dr. Segal, petitioner's expert, also recognized Mr. Jones' history of hypertension and probable arteriosclerosis, but he concluded, nonetheless, that Jones' job-related stress was a precipitating factor in his death.

rector observed that "disciplinary actions are events ... common to most, if not all, work environments" and thus that Mr. Jones' emotional reaction to such an expectable event, resulting in a heart attack, was not an accidental injury. In shifting the focus to the question whether the injury was accidental, however, the Director nonetheless relied on cases from other jurisdictions holding that employee heart attacks which did not result from physical exertion did not arise out of or in the course of employment. *Tintera v. Armour & Co.*, 362 So.2d 1344 (Fla.1978); *In re Korsun's Case*, 354 Mass. 124, 235 N.E.2d 814 (1968); *Chapman v. Aetna Casualty & Surety Co.*, 221 Tenn. 376, 426 S.W.2d 760 (1968); *City of Austin v. Johnson*, 525 S.W.2d 220 (Tex.Civ.App.1975).[3]

Finally, the Director asserted—without citation to statutory authority—that public policy should bar recovery for injuries caused by emotional stress attributable to disciplinary actions, in order to: (1) discourage disciplined employees from perceiving an incentive to suffer emotional injury; (2) encourage employers to discipline or discharge undesirable employees; (3) avoid false or frivolous claims; and (4) avoid holding employers liable for emotional injuries resulting from employee misconduct. He cited *Miller v. Town of Newburgh*, 43 A.D.2d 641, 349 N.Y.S.2d 218 (1973), which apparently concluded that public policy bars compensation where an employee's heart failure was caused by the "employer's legitimate decisions about the conduct of employment." *Id.* at 643, 349 N.Y.S.2d at 220.

The Director accordingly concluded that Jones' death was "not an accidental work-related injury." and, therefore, denied benefits.

### III.

As indicated by the conceptual dispute between the hearing examiner and the Director, there are three elements essential to a compensable workers' compensation claim. The injury must (1) be an "accidental injury" (2) that "arises out of" employment and also (3) arises "in the course of" employment. D.C. Code § 36–301 (12) (1981); *WMATA*, 506 A.2d at 1128 n. 1; *see Grayson v. District of Columbia Department of Employment Services*, 516 A.2d 909, 911 n. 2 (D.C.1986).

The Director's final decision did not address, let alone question, the hearing examiner's rulings on causation and work-relatedness: that Mr. Jones' death arose out of and in the course of employment. Rather, the Director concluded that, because disciplinary actions are not unusual events, resulting emotional injuries with physical manifestations are not accidental injuries.[4] Apparently, he was relying on Professor Larson's statement that, "[w]hen the causal component in a heart failure ... is mental, nervous, psychic or emotional rather than physical, the commonest legal question has been whether this could be said to be an [accidental] injury for compensation purposes," absent an "unusual" emotional strain, 1B Larson § 38.65 at 7–215 to 7–216, whereas the question is one of causation, not accidental injury, when a physical stressor at work is alleged to have precipitated a heart attack. *E.g., George Hyman Construction Co. v. District of Columbia Department of Employment Services*, 497 A.2d 103 (D.C.1985).

---

**3.** The Director attempted to distinguish *Ferreri v. General Auto Driving School, Inc.*, 26 A.D.2d 601, 271 N.Y.S.2d 421 (1966), which held that substantial evidence supported the agency's conclusion that an employee's fatal heart attack, occurring on his way to a lie detector test during a period of suspension, resulted from an industrial accident.

**4.** If the Director intended to rule, in the alternative, that the hearing examiner erroneously concluded that Mr. Jones' death arose out of and in the course of employment, he should have done so explicitly. *See Rhema Christian Center v. District of Columbia Board of Zoning Adjustment*, 515 A.2d 189, 198 (D.C.1986). We understand the Director's public policy arguments as intended to bolster his conclusion that Mr. Jones' death was not an accidental injury, not to establish that it did not arise out of or in the course of employment.

Interestingly, however, Larson notes that many courts do not adopt such a dichotomy. These courts conceptualize all heart attack cases as presenting a problem of "employment causation," without regard to whether the alleged precipitating stressor is emotional or physical. 1B Larson § 38.65(d) at 7–261. The courts of this jurisdiction have taken this latter—and we believe more analytically sound—approach, declining to find a conceptual difference under the statutes between heart attacks allegedly caused by emotional stress and those allegedly attributable to physical exertion at the work place. For example, in *Hoage v. Royal Indemnity Co.*, 67 App. D.C. 142, 90 F.2d 387, *cert. denied*, 302 U.S. 736, 58 S.Ct. 122, 82 L.Ed. 569 (1937), the federal circuit court of appeals concluded, in applying the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 902 (then applicable in the District of Columbia):

> We think that the testimony in the record fully considered tends to show that Mr. Rennie [a claims adjuster] by reason of mental strain, worry, and long and excessive hours of labor suffered a collapse which resulted in his total disability as found by the Deputy Commissioner. We think this collapse constituted an accidental injury within the purview of the statute. His case is comparable to that of a manual laborer whose heart collapses as a result of long continued physical strain or overwork resulting from excessive exertion.

*Id.* at 145, 90 F.2d at 390. The circuit court was dealing with a definition of compensable injury identical to the District's statute applicable in this case.

Recently, in *WMATA*, which addressed two cases of physical injury attributable to physical causes at work, we affirmed DOES' own "conclusion that the statutory language 'accidental injury' does not require that an unusual incident be the cause of the injury, but is satisfied if something unexpectedly goes wrong within the human frame." *WMATA*, 506 A.2d at 1130. We had no occasion in *WMATA* to consider whether there is an exception to this definition of "accidental injury" for injuries allegedly attributable to emotional stress; but, in light of *Hoage*, we perceive no reason why the definition is susceptible of such an exception.[5] Indeed, in *McEvily v. District of Columbia Department of Employment Services*, 500 A.2d 1022 (D.C. 1985), in which we sustained DOES' determination that petitioner's psychiatric disability was not caused by frustrations attributable to managerial changes at work, the sole issue was causation, not whether the disability allegedly derived from emotional stress attributable to a typical management reorganization was an "accidental injury."

We recognize DOES has required that, where there is proof of a pre-existing arteriosclerotic condition, as in this case, the employee must prove the heart attack was precipitated by exertion that was unusual for the employee; otherwise, the heart failure is deemed to be caused by the pre-existing condition, not to arise out of employment. *Rose v. George Hyman Construction Co.*, H & AS No. 83–226 (Aug. 27, 1984), *aff'd, George Hyman Construction Co.*, 497 A.2d at 106 n. 2 (assumes, without deciding, unchallenged validity of "unusual exertion" requirement). It is important to note, however, that DOES itself has characterized this "unusual exertion" requirement as part of causation, not accidental injury, analysis.

In sum, when read together, *Hoage, WMATA, McEvily,* and *George Hyman Construction Co.* make clear that, in this jurisdiction, the question whether a claim presents a compensable "accidental injury" does not depend on whether the employment event which allegedly caused it was an emotional or a physical stressor,

---

5. Curiously, in the present case the Director did not mention his own decisions—and definition of accidental injury—that we affirmed in *Wash-* *ington Metropolitan Area Transit Authority v. District of Columbia Department of Employment Services*, 506 A.2d 1127 (D.C.1986) (per curiam).

or whether that stressor was usual or unusual. Rather, the injury, to be "accidental," need only be something that unexpectedly goes wrong within the human frame. A heart attack clearly can meet that test. *See George Hyman Construction Co.*

The Director in the present case focused on the question of "accidental injury." In so doing, he excluded as a matter of law from the concept of "accidental injury" every heart attack attributable to a usual, emotional stressor in the work place, even though under all the circumstances the heart attack "unexpectedly" occurred. That was error. *WMATA*, 506 A.2d at 1130. The Director did not rule, alternatively, on causation. *Supra* note 4. More specifically, he did not rule, citing *Rose*, that Jones' death did not arise out of employment because a disciplinary proceeding may not be called an unusual stressor superseding a preexisting heart condition that presumably causes a heart attack absent unusual exertion in the work place. Thus, DOES' "unusual exertion" requirement announced in *Rose*—which we have never addressed, *see WMATA*, 506 A.2d at 1130 n. 5; *George Hyman Construction Co.*, 497 A.2d at 106 n. 2—is not in the case before us for review.

## IV.

Perhaps recognizing the Director's error, DOES and PEPCO urge us to affirm the decision on an alternative ground: that because the disciplinary action arose out of Mr. Jones' own misconduct, his injuries did not arise "in the course" of his employment. This we cannot do.

■ The Director did not rely on this ground in his final order any more than he relied on a *Rose* analysis. An administrative order can only be sustained on the grounds relied on by the agency; we cannot substitute our judgment for that of the agency. *Securities and Exchange Commission v. Chenery Corp.*, 318 U.S. 80, 87–88, 63 S.Ct. 454–459, 87 L.Ed. 626 (1943); *Club 99, Inc. v. District of Colum-*

*bia Alcoholic Beverage Control Board*, 457 A.2d 773, 775 (D.C.1982).

Although we must reverse, the Director, on remand, may consider the alternative ground now urged for affirmance—or any other. If he chooses to consider alternatives, he should address D.C. Code § 36–303(b) (1981) ("Every employer subject to this chapter shall be liable for compensation for injury or death without regard ... to fault as a cause of the injury or death.). *See Grayson*, 516 A.2d at 912 (standard for "arising out of employment" minimizes, if not eliminates, the concept of fault in workers compensation claims); *WMATA*, 506 A.2d at 1129 n. 4 (purpose of Workers' Compensation Act is "to hold employer responsible for all occupational injuries, regardless of fault"). He should also address D.C. Code § 36–303(d) (1981) (liability for compensation shall not apply where injury to the employee was occasioned solely by employee's intoxication). Because any unresolved question, at this point, is strictly legal, DOES need not hold another hearing on remand. *Cf. Smithsonian Institution v. District of Columbia Department of Employment Services*, 514 A.2d 1191, 1196 (D.C.1986).

*Reversed and remanded.*

NEBEKER, Associate Judge, concurring:

I agree with my colleagues that *Washington Metropolitan Area Transit Authority v. District of Columbia Department of Employment Services*, 506 A.2d 1127 (D.C.1986) (*WMATA*), compels us to remand this case to the Department for a determination whether the decedent's heart failure was a compensable "accidental ... death arising out of and in the course of employment." D.C. Code § 36–301(12) (1981). In *WMATA*, this court deferred to the Department's use of the "human frame" test for what constitutes an "accidental injury or death" under the statute and specifically rejected the contention that such language contemplates proof of an unusual occurrence. 506 A.2d at 1129–30.

Hence, inasmuch as the Department in this case associated accidental injuries or death with those resulting from unusual incidents, I believe this court is bound under the rule of *M.A.P. v. Ryan,* 285 A.2d 310 (D.C.1971), to follow *WMATA* and remand for agency reconsideration.

However, while *WMATA* ties our hands, its holding is not set in concrete because the Department on remand is free to rethink this, or any, case and adopt any reasonable interpretation of the statute it deems warranted. For the reasons stated below, I feel such reconstruction by the agency is particularly called for here. Nevertheless, if on remand the Department is content with the human frame standard of *WMATA,* it should, in my view, award compensation only if it determines as part of this analysis that the decedent's heart failure was a clinically unexpected occurrence. That is, a finding by the Department that "something *unexpectedly* went wrong within the human frame" should not be predicated solely on a determination that the decedent himself was surprised. Of course, the analysis I would require might necessitate the taking of additional evidence and, accordingly, a remand to the Department's hearing examiner.

With regard to the human frame standard itself, I consider it an amorphous test which has no place in this already difficult area of workers' compensation. To say, in this case alone, that the Department erred as a matter of law because it did not consider whether something unexpectedly went wrong within the decedent's human frame, attests to the fact that such language is now deemed the dispositive standard. Yet, it is puzzling to me how this language became talismanic. In *WMATA,* we simply deferred to the Department's use of the "human frame" test as a reasonable interpretation of prevailing law. 506 A.2d at 1130. Citing only *Wheatley v. Adler,* 132 U.S.App.D.C. 177, 181 n. 6, 407 F.2d 307, 311 n. 6 (1968), and *Commercial Casualty Insurance Co. v. Hoage,* 64 App. D.C. 158, 159, 75 F.2d 677, 678, *cert. denied,* 295 U.S. 733, 55 S.Ct. 645, 79 L.Ed.

1682 (1935), we observed in *WMATA* that "[o]ur courts had repeatedly held that the requirement of 'accidental injury' is satisfied 'if something unexpectedly goes wrong within the human frame.' " 506 A.2d at 1129. Such a "holding," however, is in fact conspicuously absent in *Wheatley* and *Hoage* given that the issue actually presented in each case was whether the injury arose out of and in the course of the employment, not whether the injury could be considered accidental. And although these words appear in *Hoage v. Royal Indemnity Co.,* 67 App.D.C. 142, 145, 90 F.2d 387, 390, *cert. denied,* 302 U.S. 736, 58 S.Ct. 122, 82 L.Ed. 569 (1937), a decision relied upon heavily by the majority here and one which does address specifically the issue of "accidental injury," the language is taken from the dicta in the earlier *Hoage* opinion. It does not purport to be the definitive interpretation. Hence, in light of its dubious development in our law, I am not surprised that the human frame standard was not applied by the Department in this case. See *ante* at 708, n. 5. Plainly, the Department, the agency charged with administering our workers' compensation laws, did not view the standard as engrained as the majority now views it.

Nonetheless, I believe the human frame standard as articulated in *WMATA* and accepted by my colleagues here is unworkable and is likely to indulge employer liability where none should exist. To be sure, the additional requirements that a compensable injury arise out of and in the course of employment will preclude recovery in many truly meritless cases. However, I perceive a great many other meritless claims in which the injury alleged will satisfy these causation criteria and be compensable under the tolerant standard of something unexpectedly having gone wrong within the human frame. Consider, for example, the case of a 65–year-old obese chain smoker who, against the advice of doctors, returns to his job as a construction foreman following recovery from a mild heart attack. On a particular day, this

hypothetical person engages in strenuous physical labor to alleviate an unanticipated crew shortage. Shortly after work, the person goes home and suffers a massive coronary from which he dies. Quite conceivably, expert witnesses would testify, and the Department would conclude, that this death arose out of and in the course of the strenuous employment. Death benefits should then be awarded, it seems, provided there is evidence (even if controverted) that what went "wrong" within the decedent's "human frame"—the massive coronary, presumably—was not to be expected under the circumstances. And, I should think that such an opinion might readily be held by a plaintiff's expert where, to add to my hypothetical, following the decedent's recovery from his first attack he withstood several weeks of similarly strenuous labor.

I would not countenance an award of compensation under these circumstances. Yet, as I view it, the standard relied upon by the majority today clears the way for recovery in such instances, and countless others where, if relief is to be provided, explicit legislation should provide it. If, however, we are constrained to apply such a test, I would stress that an accidental injury within the context of the statute is one which is truly unexpected. Thus, where the majority concludes that "[a] heart attack clearly can meet [the] test" that "the injury, to be 'accidental,' need only be something that unexpectedly goes wrong with the human frame," *ante* at 709, I would add that this will be true only if the heart attack is indeed unexpected in a most objective sense.

Finally, with regard to whether the death here arose out of and in the course of employment, I would require upon remand, and not simply permit, that the Department independently consider this question if it determines first that the decedent's heart failure constituted an accidental death within the meaning of § 36–301(12), *i.e.*, an objectively unexpected event under all the facts. A careful review of the final compensation order reveals that the issue of causation—"work-connectedness" in agency parlance—was raised but never decided because the Department rejected on legal grounds the claim that there had been an "accidental death" under the statute. Therefore, in my view, if the heart failure is found factually to be an accidental death, the Department must address for the first time the critical question of causation if it is to deem the death compensable. *See generally* 7 DCMR § 230.1 (1986); D.C. Code § 36–322(b) (1981). Since the issue was properly preserved by exception, it is not enough to say, as the majority does, *ante* at 707 that "[t]he Director's final decision did not address, let alone question, the hearing examiner's rulings on causation and work-relatedness: that Mr. Jones' death arose out of and in the course of employment." Nor is it fair to deny the employer complete review because the Department failed explicitly to rule in the alternative. *See ante* at 707 n. 4.

Finally, there being a justiciable question of causation on remand if decedent's heart failure is deemed an accidental death, the Department is free to decide whether, as a matter of law, its "unusual exertion" requirement for cases involving a pre-existing heart condition is met by emotional stress attendant to disciplinary proceedings. *See WMATA, supra,* 506 A.2d at 1130 n. 5; *George Hyman Construction Co. v. District of Columbia Department of Employment Services,* 497 A.2d 103, 106 n. 2 (D.C.1985).