Ulyses MORRIS, et al., Petitioners,

v.

DISTRICT OF COLUMBIA DEPARTMENT OF EMPLOYMENT SERVICES, Respondent.

No. 85–234.

District of Columbia Court of Appeals.

Argued May 27, 1986.

Decided Aug. 24, 1987.

---

John F. Lillard, III, Washington, D.C., for petitioners.

Michele Giuliani, Asst. Corp. Counsel, with whom John H. Suda, Acting Corp. Counsel at the time the brief was filed, Charles L. Reischel, Deputy Corp. Counsel, and Richard B. Nettler, Asst. Corp. Counsel, Washington, D.C., was on the brief, for respondent.

Before NEBEKER, MACK and STEADMAN, Associate Judges.

STEADMAN, Associate Judge:

For the first time, we are presented with a substantive case involving the "Victims of Violent Crime Compensation Act of 1981" ("the Act"), D.C.Code §§ 3–401 et seq. (1986 Supp.).[1] In October 1982, Ulyses Morris, Jr., age 16, was fatally shot in front of his home. His parents (petitioners) filed a claim that was denied by the Office of Crime Victims Compensation (OCVC), a branch of the Department of Employment Services (DOES), in a "preliminary determination." Id. § 3–411(b)(2). They then obtained a hearing on their claim as a "contested case" before the DOES Office of Appeals and Review, pursuant to § 3–411(b)(3). Following an adverse decision in that proceeding as well, they filed a petition for review in this court under § 3–412.[2] Because we harbor some uncertainty as to the totality of the reasoning underlying the final DOES decision (attached as an appendix to this opinion), and considering the significance of this case as one of first impression, we reverse and remand for amplification and possible further proceedings.[3]

## I. The Act

The Act in its general functioning is straightforward, although its detailed interpretation is not. A "claimant" who suffers "economic loss" as a result of a "crime of violence" may file a claim with OCVC. §§ 3–401(1), (3), (5). First, the claimant is determined to be "eligible for compensation." § 3–402. Second, the amount of the claimant's economic loss, decreased by compensation from collateral sources, is determined, up to a maximum of $25,000. The amount so determined is the potential award of compensation under the Act. § 3–403(b). However, finally, the award is to be denied if the claimant will not suffer "undue financial hardship" if the award is not made to the claimant. § 3–403(c).

Three classes of individuals may be "claimants" under the Act: a crime victim, a surviving dependent of a deceased victim, and "a person who is responsible for the maintenance and support of a victim, and[4] who incurs expenses on behalf of the victim for economic loss incurred as a result of the injury or death of the victim." § 3–401(1)(C). Petitioners made their claim under the third category,[5] asserting that

---

1. We have recently dismissed two appeals involving the Act for failure to exhaust administrative remedies. *Siler v. DOES,* 525 A.2d 620 (D.C.1987); *Armstead v. DOES,* No. 86–355 (D.C. May 21, 1987). In both cases the claimants failed to seek a "contested case" hearing after an adverse "preliminary determination" under D.C. Code § 3–411(b)(2) (1986 Supp.).

2. Petitioners raise a number of points on appeal. As will become evident, the decision of DOES is far from pellucid in several respects, perhaps understandably considering the nature of the issues. We deal only with those matters relevant to this appeal at this time.

3. Petitioners argue that reversal is required in any event because DOES violated its own regulations by not issuing its order within 20 working days of the hearing. (The order was approx-

imately 200 days late.) We do not believe that a proper sanction would be to force DOES to compensate otherwise ineligible claimants. *See Brock v. Pierce County,* 476 U.S. 253, 106 S.Ct. 1834, 90 L.Ed.2d 248 (1986) (where dilatory federal agency missed its statutory deadline, court held that "where there are less drastic remedies available for failure to meet a statutory deadline, courts should not assume that Congress intended for the agency to lose its power to act").

4. The DOES order under review erroneously uses the word "or" in defining this category of claimant. The difference could be significant.

5. Petitioners' original application indicated that Mrs. Morris was claiming as a dependent of her son, but petitioners' consistent position subse-

they had suffered "economic loss" as a result of their son's death.

For those filing claims following the death of a crime victim, "economic loss" is defined as follows:

> (B) For a dependent or person responsible for the maintenance of a victim as described in paragraph (1)(C) of this section:
>
> (i) Actual expenses of the victim's funeral and burial but not to the extent that the expenses exceed $2,000;
>
> (ii) Loss of the victim's support;
>
> (iii) Loss of the victim's services, including housekeeping and child care services; and
>
> (iv) All actual and reasonable expenses incurred for medical treatment (including ambulance, hospital, surgical, nursing, and other medical and professional services and devices) of the victim prior to his or her death which results from a crime of violence.[6]

Petitioners sought compensation for economic loss under subparts (ii), loss of the victim's support, and (iii), loss of the victim's services.[7]

## II. *Loss of Support*

With respect to loss of support, petitioners presented evidence that their son contributed earnings from odd jobs of about $30 per week to household expenses. They thus calculated their total economic loss in this regard as $52,416. The figure was arrived at by multiplying $30 by 52 weeks by the 33.6-years' life expectancy of the mother. Since the statutory cap on awards is $25,000, under § 3–403(b), the claim was necessarily limited to that maximum.

Two possible problems exist with this analysis. One is that no offset is made to reflect the fact that claimants no longer are liable for outlays to support their minor son. This reveals a possibly more funda-

mental obstacle to recovery—that claimants in their category may not be able to recover "economic loss" of the type they are claiming. It seems illogical to say that a claimant is eligible to file a claim because he is "responsible for the maintenance and support of a victim" and then allow recovery for "loss of the victim's support." It is the claimant who is supporting the victim, not vice versa. The contribution by the son of $30 per week simply reduces the amount of support necessary for the claimants to provide him; it is not necessarily a separate "economic loss" resulting from the death of the victim.

This reading of the statute is supported by certain language in the statute and the legislative history. Section 3–401(1)(C), which defines claimants, requires that a person responsible for the maintenance and support of a victim must also be one "who *incurs expenses* on behalf of the victim for economic loss incurred as a result of the injury or death of the victim." (Emphasis added.) This could be read to exclude such claimants from seeking "loss of support" or "loss of services" under §§ 3–401(5)(B)(ii) and (iii), and instead to restrict this type of claimant to expenses incurred for medical treatment and funeral expenditures on behalf of the victim. *See* §§ 3–401(5)(B)(i) and (iv). Furthermore, the report accompanying the proposed act describing the relevant section, § 3–401(5)(B), states: "The second item of economic loss is loss of the victim's support. This includes financial support that the victim would have provided *to the dependent had the victim survived*." (Emphasis added.) Council of the District of Columbia Report, Bill No. 4–361 (1981) at 7.

If DOES indeed interprets the Act in this manner, it would explain the fact that DOES in its consideration of the claimed "loss of the victim's support" did so solely

---

quently has been that they are claiming as persons responsible for the victim's maintenance and support. Their status as such claimants and their eligibility under § 3–402 are not issues on this appeal. (The DOES decision found that petitioners clearly were not dependents under the Act.)

6. D.C.Code § 3–401(5)(B) (1986 Supp.).

7. Petitioners also suggested they were entitled to compensation under § 3–401(5)(A)(iii) for "loss of net income," but this category appears to apply only in cases of victims who survive the crime.

in the context of the claimants' status as "dependents" of the victim. DOES sets forth a number of substantially unchallenged facts establishing that the claimants did not meet the definition of dependent in the statute,[8] and concluded that therefore "no economic loss has been shown for loss of victim's support." Clearly if DOES does in fact interpret the Act as allowing only a dependent to make such a claim, the failure to prove dependency disposes of the issue.

On the other hand, there are also indications that persons responsible for the maintenance of a victim are not automatically barred from claiming loss of support under the Act. First, § 3–401(5)(B) defines economic loss for a dependent or person responsible for the maintenance of a victim without expressly stating that subsections (ii) loss of support and (iii) loss of services do not apply to persons responsible for the maintenance of a victim. Second, the implementing DOES regulations may suggest that claimants can make out a loss of support claim without showing that they are dependents as defined in the statute. DOES Rule 109.5, 29 D.C.Reg. 5211–13 (1982), sets forth the procedure for computing "loss of support." DOES Rule 109.5(c) governs petitioners, as "parents of the victim."[9] This section makes no provision for establishing the dependency of the parents on the child-victim. However, the next section, DOES Rule 109.5(d), governs claimants who are "dependent for principal support upon the victim" and that section explicitly requires a finding of 50% support of the claimant by the victim. If DOES Rule 109.5 subsections "a-e" are read independently,[10] then under this analysis, parents of victims like petitioners could recover loss of support if they could show that there is a net loss in the household. DOES Rule 109.5(c). In this case, petitioners presumably would have had to show that they expended on the victim less than the $30 per week the victim brought into the family.[11] It does not appear that DOES performed this calculation in reaching its conclusion that no economic loss had been shown.[12]

### III. *Loss of Services*

Petitioners also claimed that they had suffered economic loss from the loss of their son's services. DOES found that the son performed various tasks around the house (such as cleaning, vacuuming, and removing the trash) occupying about fifteen hours a week. DOES stated that while petitioners had claimed that the loss of these services would cost an additional $201 per month,[13] it had not been shown that such additional expense was "reasonable or necessary." It also observed that there were three other adult persons to share in the carrying out of these chores, which would amount to less than one hour

---

**8.** One may claim as a dependent only if he or she "depended upon the victim for more than one-half of his or her support at the time of the commission of the crime upon which the claim is based." D.C.Code § 3–401(4).

**9.** DOES Rule 109.5(c) states:
  (c) If the claimant is a parent of the victim:
    (1) Determine the actual amount of annual support provided to the claimant by the victim.
    (2) Determine the average number of remaining years the claimant could have expected to be supported by the victim using the above referenced table.
    (3) Multiply the net annual amount of support contributed to the claimant by the number of years during which support could have been expected.

**10.** Sections 109.5(a, b and e) of DOES Rule 109.5 govern surviving spouse with dependent children, guardian, and pensioner claimants.

**11.** The DOES decision states that the victim's contribution of approximately $30 per week could not be verified. Our review of the record indicates that there was ample testimony and affidavits to substantiate this figure, and the hearing examiner did not state that she disbelieved any witnesses.

**12.** In its brief, DOES asserts that even if petitioners could seek an award under "loss of support," the $30 per week contribution by the victim did not amount to "undue financial hardship." The DOES decision does not appear to rely on this basis for its denial of the "loss of support" claim. However, if after applying a set-off, petitioners appear to have suffered a net loss, DOES would then be required to apply the "undue financial hardship" test.

**13.** This figure was arrived at by multiplying 15 hours per week by the minimum hourly wage in the District.

per day per person, and thus there was no loss of the victim's services to cause an "undue financial hardship." [14]

Again, we have some uncertainty in discerning the correct basis for the DOES decision denying any compensation for the loss of services, even assuming that that loss of the victim's services is a category under which a person responsible for maintenance and support may recover.[15]

DOES Rule 109.6, dealing with the computation of economic loss suffered as a result of loss of the victim's services, reads as follows:

> In computing loss of services, the following rates shall apply:
>
> (a) The purchase or reimbursement of services such as laundering, cleaning, child care, administration of medication, marketing, and meal preparation shall not exceed the minimum hourly wage rate. When these services are provided by a member of the family of the victim or claimant, the Office may pay the net loss of earnings incurred by such family member not to exceed $200 per week, if the family member was not otherwise reimbursed for such earnings;
>
> (b) Expenses reasonably incurred in obtaining ordinary and necessary services in lieu of those the injured person would have performed, not for income but for personal benefit of the family, if the victim had not been injured. Reimbursement will not exceed the minimum hourly wage rate.

29 D.C.Reg. 5213–14 (1982). Here, DOES made a determination that it would not be "reasonable or necessary" for the family to incur additional expenses for performing the household tasks undertaken by the son, perhaps alluding to section (b) of the rule. Although DOES made this conclusion as part of its discussion whether the parents were "surviving dependents" of the son, it appears to be also related to the issue whether any "economic loss" was in fact suffered from loss of the son's services. The conclusion is also bolstered by the facts related in the subsequent discussion mentioning undue financial hardship, where DOES points out that the fifteen hours per week of chores performed by the son could be performed by the three adult members of the household at less than one hour a day each. (If such a time expenditure resulted in a net loss of earnings to any family member, presumably compensation could be sought under subsection (a) of the regulation.) Furthermore, it should be observed, the net economic impact of the loss of services in the type of situation before us presumably would reflect the offsetting expenses of supporting the person providing the services. Note should also be made of the fact that petitioners' right to make any claim at all is dependent on their status as one who "incurs expenses." § 3–401(1)(C).

Thus, it is possible to read the DOES decision as an effective holding on the facts of this case that the parents have suffered no "economic loss" arising from lost services.[16] In contrast, petitioners seem to argue that the only proper procedure is simply to determine the monetary equivalent of the services performed by the victim and deem that figure the "economic loss." We are cited to *Holmes v. Criminal Compensation Board,* 278 Md. 60, 359 A.2d 84 (1976).

---

14. As will be indicated, the factors set forth in this paragraph are gathered from several parts of the DOES opinion.

15. Whether this assumption is correct as representing DOES's final interpretation of the statute may turn on how it ultimately views the right of such claimants to recover for loss of support, as discussed above.

16. The key sentence is: "Further, this Examiner sees no loss of the victim's services to cause an undue financial hardship." One reading is that there has been no economic loss in the loss of the victim's services, and hence no loss in fact exists to "cause" an undue financial hardship. In this sense, the focus is on the definition of "economic loss" in § 3–401(5)(B). Another reading is that whatever the economic loss may be from the loss of the victim's services, the claimant will not suffer "undue financial hardship" if he is not granted financial assistance in the amount of such economic loss, and hence the loss does not "cause" an undue financial hardship. In this sense, the focus is on the definition of "undue financial hardship" in § 3–403(c)(1).

In that case, the decedent was the mother of three adult and seven minor children. She had a regular job, but in addition to her monthly wages, she provided "maternal services" (*i.e.*, cooking, housekeeping and the like) for the household. After her death, these maternal services were assumed by two of the adult children. The minor children sought benefits under Maryland's Criminal Injuries Compensation Act. The Maryland court held that the economic value of the loss of "maternal services" should be considered in determining whether the minor children had suffered "serious financial harm" as a result of the death of their mother. The court reasoned that the loss of the mother's services did constitute a loss of a pecuniary nature that could result in financial hardship. However, quite apart from the fact that the Maryland statutory scheme is significantly different from that of the District, the *Holmes* case is plainly distinguishable. There, it was conceded that the family would have been justified in hiring an outsider to perform the services that the adult children had undertaken; here, we have a supportable finding that such an expenditure would not be "reasonable or necessary." Furthermore, in *Holmes* the claimants were dependents of the victim, so that the services came at no cost to them; here, the claimants supported the victim who provided the services.

### IV. *Undue Financial Hardship*

In the final three paragraphs of its decision, DOES addressed the issue of "undue financial hardship."[17] Here, DOES was dealing with that portion of the Act which limits payments for proven economic loss-

es. In pertinent part, the relevant section, D.C.Code § 3–403(c)(1), reads:

> An award of compensation shall be denied if it is determined that the claimant will not suffer undue financial hardship if not granted financial assistance pursuant to this chapter. A claimant suffers undue financial hardship if the claimant cannot maintain the customary level of health, safety, and education for himself or herself or his or her dependents. In determining whether the claimant will suffer undue financial hardship, all relevant factors shall be taken into consideration, including, but not limited to: (A) The number of the claimant's dependents; (B) the usual and ordinary living expenses of the claimant and the claimant's dependents; (C) any special needs of the claimant and the claimant's dependents; (D) the claimant's income and potential earning capacity; and (E) the claimant's resources. If the claimant is 65 years of age or older, the value of the claimant's house and any savings up to an amount of $10,000 shall not be taken into consideration in determining whether the claimant will suffer undue financial hardship.

The first application that DOES makes of this section is to hold "[f]urther, this Examiner sees no loss of the victim's services to cause an undue hardship."[18] Reference is then made to the fact that the three adults can do the chores in less than an hour a day each. Thus, under DOES's approach, a direct tie seems to be made between the nature of the economic loss and the "undue financial hardship" that would occur if the monetary award were not made.[19] Other-

---

**17.** This was the sole ground upon which OCVC denied the claim in its "preliminary determination."

**18.** This is on the assumption that the quoted sentence from the DOES opinion is construed to have the second of the two possible meanings discussed in footnote 16 *supra.*

**19.** The "preliminary determination" of OCVC makes the tie-in more explicit. It stated: "Based on financial resources and monthly expenses information contained in your application, you will not suffer undue financial hardship *as to support and loss of services* if denied an award. Pursuant to § 4(c)(1) of D.C.Law

4–100 [§ 3–403(b)(1)], your claim is hereby denied." (Emphasis added). Also, § 5(g)(1) of the Uniform Crime Victims Reparations Act, on which § 3–403(c) of the D.C. Act seems in part based, is more precise in this regard. It states, in part:

> Reparations may be awarded only if the Board finds that unless the claimant is awarded reparations, he will suffer financial stress *as the result of* economic loss otherwise reparable. A claimant suffers financial stress only if he cannot maintain his customary level of health, safety, and education for himself and his dependants without undue financial hardship.

wise put, DOES appears to read the section as requiring that the inability to maintain the customary level of health, safety, and education must flow directly from the losses caused by the victim's death,[20] although we may err in this understanding of DOES's interpretation. Petitioners' argument, on the other hand, in its subtlest sense, is that once a determination is made that a compensable economic loss has occurred, the determination of whether failure to pay the award will cause undue financial hardship should be made wholly apart from the specific economic loss underlying the award; that is, it need not be assumed that the petitioner will spend the money awarded directly to compensate for the economic loss suffered. Thus, petitioner asserts that once the value of the lost services is determined, in this case a claimed $201 a month, the issue is not whether the services can be performed by other members of the family but rather whether without receiving an additional $201 a month, the claimants will be unable to "maintain [their] customary level of health, safety, and education." For example, a claimant might lose a job sometime after the death of the victim but for reasons totally unrelated to the crime or his health may decline requiring additional medical expenditures; in such circumstances, he may very well need the crime compensation award to maintain his customary level of living, although not spending it to replace the lost services.

In the last two paragraphs of its decision, DOES expands upon the subject of undue financial hardship. It states that it has taken into account all relevant factors, including those set forth in § 3–403(c)(1), as well as the fact that claimants' income and resources are greater than their expenses, and concludes that "this result [presumably denial of the claim] is mandated by the Act."

A principal focus of the hearing before the DOES examiner and of the argument on appeal has been on the issue whether petitioners fall within the "no undue financial hardship" exception. This is quite understandable since that was the stated basis for the denial of the claim in OCVC's "preliminary determination." However, the question of "undue financial hardship" is of course not reached if the claimant is not otherwise entitled to financial assistance under the Act, *i.e.*, has not suffered uncompensated economic loss. As indicated, the DOES in its decision finally denying the claim may have effectively determined, under its interpretation of the Act, that the claimants had in fact not suffered any "economic loss" for either support or services. If we are correct in our understanding, then the discussion of undue financial hardship is at most a cumulative or alternative ground unnecessary to the decision.[21]

We might add that our uncertainty on this point is confirmed by a reading of the testimony at the hearing given by Eric Cox, an officer of the Crime Victims Compensation Program. In explaining why OCVC had denied the claim in its preliminary determination, he testified:

> Well, we proceeded to deny them due to the fact that they did not really qualify for the loss of support since at no time did they note to us that—Ulyssus [*sic*] Morris, the victim was providing 50 percent or more of their income. Truly,

(Emphasis added.)

20. Under this analysis, claimants asserting financial hardship would seem to be required to present evidence of their economic condition and mode of life immediately prior to the crime as well as subsequent to the crime, so that the two may be compared and the causes for any change determined. Indeed, such a before and after comparison seems called for by the statement of the test as whether the claimants may "maintain their customary" levels of health, safety and education.

21. Whether DOES could have rested its final decision solely on the ground of no proof of economic loss, considering the nature of the notice given of the hearing, is a problematical question. We do not think this issue should completely control the disposition of the present appeal. The fact that OCVC chose to rule against claimants solely on the basis of no undue financial hardship, without previously exploring the question whether any economic loss had in fact been incurred, should not totally preclude subsequent consideration of this question. *See* note 23 *infra*.

from statements that they made there was a loss of service, upkeep of the home and that sort of thing, but not to the point that this office saw that three adults could not clean up behind themselves, who were the remaining adults in that household.

We did not foresee them having the need of a maid. And, statements made such as trash piling up—this office took them to the count with that. That those—surviving members of the family were the people who were making the trash. So, naturally, they should have been able to take the trash out.

These are the basis that the office denied the claim. I have not—not suffering any undue financial hardship.

Thus, the bulk of the quoted testimony seems to support a determination of no economic loss under the possible interpretations discussed earlier in this opinion, rather than no undue financial hardship.

### V. *Conclusion*

In sum, for the reasons stated, we have considerable uncertainty in discerning the full scope of DOES's rationale underlying its final denial of the claim. In this posture, we think it would be a mistake for us now to attempt to deal with the "undue financial hardship" provision in isolation.[22] We are faced here with two basic principles of judicial review of administrative decisions. First, as we have often recognized, the interpretation of a statute by an agency entrusted with its execution is to be given considerable deference, *see, e.g., MCM*

*Parking Co. v. District of Columbia Department of Employment Services,* 510 A.2d 1041, 1043–44 (D.C.1986), and an agency ought ordinarily to have the first opportunity to state clearly its determination of statutory meaning. Second, as is equally well-established, an administrative order can be sustained only on the grounds relied on by the agency; we cannot substitute our judgment for that of the agency. *Jones v. District of Columbia Department of Employment Services,* 519 A.2d 704, 709 (D.C.1987), citing *Securities and Exchange Commission v. Chenery Corp.,* 381 U.S. 80, 87–88, 63 S.Ct. 454, 459–60, 87 L.Ed. 626 (1943). Accordingly, we are remanding the case for further proceedings not inconsistent with this opinion.[23]

So ordered.

### APPENDIX

CARRIE BULLOCK—OCVC—15(83)

Ulyses Morris, Deceased

1424 Chapin Street, N.W., Apt. No. 52

Washington, D.C. 20009

FINDINGS OF FACT:

Claimants, surviving parents of the victim, filed a claim for Crime Victims Compensation on February 7, 1983. They appealed on February 26, 1984 and March 16, 1984 from a Preliminary Determination denying benefits.

The hearing was convened April 19, 1984. Claimants, their witness, and Agency witness and representative were present.

---

**22.** Even were we in a position to deal with the financial hardship issue in petitioner's favor, a remand would probably be required. As Mr. Cox observed at the DOES hearing, had DOES overruled OCVC on that issue, the case would have to be sent back to OCVC since "the office has not made a determination on the amount of compensation at all." We also observe that on the present state of the record, we might have had to remand in any event. An important element in the analysis of financial hardship is the present income to the claimants. The testimony on this point is confusing. The findings of fact state: "The income is $18,474.71 per year.... The monthly income is $1,294.00.... The net monthly income is $1,039.00." Twelve times 1294 is not 18474.71.

**23.** In doing so, we observe that the "preliminary determination" denied the claim only on the basis of no undue financial hardship, and petitioners entered the hearing to contest this issue. *See* D.C.Code § 1–1509(a) (notice of hearing in contested case shall state "time, place, and issues involved"). Therefore, petitioners should have the right, if they wish, to request that the hearing be reopened with respect to the matters other than undue financial hardship perhaps effectively dealt with in the DOES opinion as discussed above. There is, of course, nothing illogical in OCVC's disposing of a claim initially on the basis of no undue financial hardship, simply assuming that some economic loss could be shown. However, as indicated, it does not appear that DOES necessarily took that sole approach in finally denying the claim.

The victim was killed near his home, and was sixteen years of age at the time of his death.

The victim was a student at the time of his death, and earned income by performing odd jobs and janitorial work services for neighbors. His earnings approximated $30.00 per week, according to his parents; however, those figures could not be verified. Further, the victim performed household tasks which had to be assumed by other family members since his death.

The household now consists of three persons: the mother, who works a full-time and part-time job; the father, who works a full-time job; and a brother, who works part-time. The income is $18,474.71 per year. The yearly expenses are $12,000.00. The monthly income is $1,294.00. The monthly expenses are $1,000.00. The net monthly income is $1,039.00. Further, testimony at the hearing revealed claimants had a savings account of $5,092.09.

Claimants made application for loss of support services, medical bills, and funeral expenses. The medical bills and funeral bill were paid by a collateral source.

CONCLUSIONS:

Section 2(1)(A)(B)(C) of the Act defines a claimant as any person who claims compensation under the Act, who is a victim (not applicable in this case), a surviving dependent of a deceased victim, or a person responsible for the maintenance and support of a victim, or who incurs expenses on behalf of the victim for economic loss due to injury or death of victim.

*Surviving dependent:* The Act defines a dependent as a survivor who depended upon the victim for more than one-half (½) of his or her support at the time of the commission of the crime upon which the claim is based. Section 2(4) of the Act. In the instant matter, the victim was a minor child, who, from time to time, contributed $30.00 per week to the household. He had no responsibility for providing shelter, food, or clothing for his parents or other sibling. He performed household tasks for which he was not compensated monetarily, but which logically would be included as actions reasonable and necessary in being a part of a family grouping. While claimants' representative has maintained the loss of the victim's help around the house would cost an additional $201.00 per month, it has not been shown that such additional expense is reasonable or necessary. The victim's parents earned between them over $354.00 per week, and clearly were not dependent upon the victim's sometime earned $30.00 per week for more than one-half of their support.

No economic loss has been shown for loss of victim's support as outlined above.

Further, this Examiner sees no loss of the victim's services to cause an undue financial hardship. The victim performed household tasks, including cleaning, vacuuming, removing the trash, and is reported to have spent 15 hours per week on those chores. Upon victim's death, there were three other adult persons to share in the carrying out of those functions which would amount to less than one hour per day per person.

The Act in Section 4(C)(1) requires a denial of any award if no undue financial hardship would be suffered. Based on the income, savings, and expenses claimants have reported, no undue financial hardship has been shown. All relevant factors have been considered, including (1) the number of claimants' dependents (one); (2) the usual and ordinary living expenses as stated above; (3) any special needs, i.e., the father's blood pressure medicine; (4) the claimants' income and potential earning capacity; and (5) the claimants' resources.

When claimants income, savings and expenses are considered, this Examiner concludes that claimants' income and resources are greater than their expenses. This result is mandated by the Act.

DECISION:

Claimants' appeal is denied.