The **CAPITAL HILTON HOTEL, Petitioner,**

v.

**DISTRICT OF COLUMBIA DEPART-MENT OF EMPLOYMENT SERVICES, Respondent.**

No. 88–704.

District of Columbia Court of Appeals.

Argued Sept. 21, 1989.

Decided Nov. 6, 1989.

Stewart S. Manela, with whom Michael L. Stevens, Washington, D.C., was on the brief, for petitioner.

Marc Fiedler, with whom Glenn K. Garnes, Washington, D.C., was on the brief, for Intervenor Napoleon Davila.

Martin B. White, Asst. Corp. Counsel, with whom Frederick D. Cooke, Jr., Corp. Counsel at the time the memorandum was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the memorandum, filed a Memorandum of the District of Columbia in Lieu of Brief on behalf of respondent.

Before ROGERS, Chief Judge, and SCHWELB and FARRELL, Associate Judges.

FARRELL, Associate Judge:

In April 1985, claimant Napoleon Davila (claimant or Davila) was lifting and carrying tables while engaged in his duties as a banquet houseman for the Capital Hilton Hotel (petitioner or Hilton) when he suffered a rupture of a berry aneurysm at the base of his brain. Following an emergency operation and Davila's partial recovery, the Department of Employment Services (DOES) awarded him temporary total disability benefits from the date of the injury to the present time. Hilton has petitioned for review, raising claims that relate to both the "arising out of" and "accidental injury" elements of a compensable injury under the District of Columbia Workers' Compensation Act of 1979, D.C.Code §§ 36–301 to –345 (1988). The principal among these contentions is that before compensation can be awarded to an injured employee suffering from a preexisting heart or vascular disorder, the claimant must offer proof that the injuries were precipitated by an exertion unusual for that employee. We affirm the order awarding compensation.

I.

Claimant's duties as a banquet houseman consisted of setting up tables, assembling speaker platforms, and putting up room dividers for banquet functions at the Hilton. As a normal part of his job, he carried tables and platform sections each weighing forty pounds or more and up to eight feet in length. The most intensive work took place between 10:00 a.m. and 2:00 p.m., and during these hours—at least at the busy time of year, which included April—a crew of six to eight housemen might have to set up a room in as little as five or ten minutes for each such "turnover". Claimant had worked for Hilton for more than five years.[1] Apparently to his employer's satisfaction, he prided himself on working faster than anyone else;[2] unlike his coworkers, he regularly carried two tables at a time and a single platform section by himself.

On April 24, 1985, claimant was part of a work crew consisting of four men instead of the usual six to eight, which required him, as the hearing examiner found, to work faster than usual.[3] Shortly before 11:45 a.m., claimant and two coworkers were transporting tables to the storage room. Claimant was carrying two forty

---

1. He originally worked for Hilton for about seven years, then left to work on the construction of Metro for five years, and returned to Hilton where he again had been employed for about five years.

2. As Davila testified, "I was the only one who didn't need anybody to tell me that I had to do [it] this way. I did it like that, as fast as I could.... Even they [his supervisors] would call me on Saturdays and Sundays to come and work. They would call me on the phone any time, any day."

3. Petitioner contends that the examiner's finding that claimant was working faster than he usually did on April 24, 1985, lacks substantial support in the record. We reject that contention in note 9, *infra*.

pound tables by himself. Carlos Velasquez, who was second in line behind him, testified that the worker immediately behind claimant came running and told him that Davila was on the floor. A paramedic was summoned and claimant was rushed to the hospital, where Dr. Arthur I. Kobrine examined him and concluded that he had suffered a subarachnoid hemorrhage or rupture of a berry aneurysm. Dr. Kobrine operated on Davila and removed or "clipped" two unruptured aneurysms as well as the one that had caused the injury.

At the workers' compensation hearing, the expert medical testimony was provided by Dr. Kobrine for the claimant and Dr. Raymond B. Jenkins for the employer.[4] The experts agreed in describing the nature and formation of berry aneurysms, but they disagreed sharply on whether a causal relationship exists between physical exertion and increased blood pressure, on the one hand, and the rupture of aneurysms on the other. A berry aneurysm is a blistering or ballooning out of an arterial wall, usually at the base of the brain, which develops as a result of a congenital weakness of the muscle wall of the artery. Although some aneurysms remain static and never burst, others enlarge from the constant pressure of blood across the arterial wall, and as they do so the wall becomes thinner. If bleeding occurs it may be slow, causing headaches, stiff necks or backaches, or it may be apoplectic, resulting in a stroke with cataclysmic results. Claimant's ruptured aneurysm measured 1½ centimeters, which both doctors agreed was moderately big.

On the basis of claimant's medical record and relevant studies in the field, Dr. Jenkins expressed the opinion that there was no causal connection between the work claimant was performing and the rupture of his aneurysm. Ultimately, in Dr. Jenkins' view, the fact that claimant was at work when the aneurysm burst was a matter of "statistics" or happenstance. He agreed that claimant had been diagnosed as having hypertension. He explained, however, that increased blood pressure does not correlate statistically with the rupture of aneurysms, and that patients clinically studied who had suffered from hypertension did not experience a greater number of ruptured aneurysms than other people. Dr. Jenkins was similarly unable to link physical exertion to ruptured aneurysms, pointing out that "when you take a series of people who have burst their aneurysms, it is spread across all activities, from sitting watching television, to being fast asleep in bed, to cheering on the Redskins." He cited a clinical study of 140 patients in which, for example, 13 had experienced a ruptured aneurysm while sleeping, 24 had done so while at relative rest, and 23 during more strenuous activity. Dr. Jenkins disagreed, therefore, with the "usual wisdom" that increased exertion and blood pressure are a major mechanism in causing aneurysms to burst. At the same time, he agreed that "in certain specific instances a rise of blood pressure is correlated with the bleeding of an aneurysm," giving the example of people cheering for the Redskins; and he noted that persons awaiting operation for a leaking aneurysm will commonly be given stool softeners to avoid the strain that can produce an aneurysmal rupture.[5]

---

4. Dr. Jenkins was an experienced neurologist, a specialist in dealing with diseases of the brain, spinal cord and nervous system who had diagnosed large numbers of cases involving ruptured aneurysms. Dr. Kobrine was a neurosurgeon and had performed surgery on subarachnoid hemorrhage patients over 100 times during the past twelve years.

5. In his February 5, 1987 medical report Dr. Jenkins had reached similar conclusions. He opined there that because the wall of Davila's aneurysm "had reached a critical state of thinness on the date in question," the aneurysm "was destined to bleed and just happened to do so while he was at work." He acknowledged, however, that "certain strains seem to be the immediate predisposing factor" of such ruptures, citing causes such as "straining at stool, rage, cheering on the Redskins, or anything which can produce a difference in blood pressure." He also assumed that "tremendous physical strain in a work situation" could have the same effect. He understood, however, that at the time of Davila's rupture he had been engaged only in "rolling round table tops along the floor and stacking them against the wall," and perhaps moving chairs; and he could not "conceive that rolling tables or lifting a chair" was

Dr. Jenkins also described the symptoms and likely consequences of a "sentinel" or premonitory bleed of an aneurysm. A sentinel bleed usually produces a severe headache and possibly back stiffness, and most aneurysms that have bled in this manner go on to rupture. Noting that Davila had recently complained of headaches and neck stiffness, and was not a "headachy" person, Dr. Jenkins concluded that he had experienced a sentinel bleed. This fact, however, merely fortified the doctor's ultimate conclusion: Davila's aneurysm was "of such a size with a wall of such thinness" that it was "in a state of imminent bleeding" whether or not it had previously bled. Because a rupture of the aneurysm had "reached the point of inevitability," it was irrelevant in the end whether Davila was at work or what kind of activity he was engaged in when the rupture occurred. The aneurysm would have ruptured "minutes later or hours later," at most within "a number of tens of hours," and not "days and weeks later." It "ruptured because it was ready to."

Dr. Kobrine differed sharply with Dr. Jenkins about the correlation between ruptured aneurysms, increased blood pressure, and physical exertion. In his opinion, the activity Davila was engaged in on the date of his injury was the direct precipitating cause of the rupture of his aneurysm. Dr. Kobrine explained that an aneurysm enlarges and its walls grow thin because the arterial wall of the blood vessel cannot withstand the pressures of the blood in the blood vessel. Thus, an aneurysm "is more likely to rupture with changes in blood pressure across the wall of the aneurysm," and a primary factor causing such increased pressure is physical activity. Aware of the kind of work that Davila customarily performed, Dr. Kobrine stated that "if I had found this patient with an unruptured berry aneurysm in his head,

there would have been absolutely no doubt in my mind that the type of work he was doing put him at increased risk for the aneurysm rupturing...." The risk was even greater if Davila had experienced an earlier sentinel bleed: "there would be no doubt ... in the minds of all the neurosurgeons in the United States that care for patients with aneurysms and subarachnoid hemorrhage that physical activity can and will precipitate rupturing of berry aneurysms, particularly in patients who had a sentinel bleed." [6] Whether or not there had been a sentinel bleed, however, Dr. Kobrine concluded that "the work [Davila] was doing was physically stressful and caused a rise in his systemic arterial pressure which caused an increase in the transmural pressure across the wall of ... an aneurysm[,] which resulted in rupture of blood through the aneurysm wall."

## II.

In upholding Davila's claim for compensation, the hearing examiner found that as a result of the manpower shortage on April 24, 1985, claimant and the other housemen were obliged to work faster than normal, and that claimant had collapsed while performing his duties and after carrying two forty pound tables. The examiner thus concluded that Davila's subarachnoid hemorrhage was causally related to his work activity. In crediting the opinion of Dr. Kobrine over that of Dr. Jenkins, he noted that in Dr. Jenkins' February 5, 1987 report, *supra* note 5, while concluding that Davila's aneurysm "was destined to bleed and just happened to do so while he was at work," the doctor had conceded that certain forms of stress can be "the immediate predisposing factor," including "anything which can produce a difference in blood pressure," but that in his opinion rolling a table or lifting a chair were insufficient to produce such a strain. Dr. Jenkins' conclu-

sufficient stress to cause an aneurysm to rupture. In essence, that activity was "no whit different from the ordinary activities of daily living in [Davila's] home or elsewhere."

**6.** Unlike Dr. Jenkins, Dr. Kobrine was not convinced that Davila had suffered a sentinel bleed. Noting the indications that Davila had com-

plained of occipital headaches for two weeks before the rupture, he explained that in his experience, "that generally is not the kind of symptomatology that accompanies a sentinel headache," which is "a headache for a day or two that goes away."

sion that Davila's work activities were no different from his "ordinary activities of daily living," the examiner found, ignored the fact both that claimant was working faster than normal on the day in question and that he was not merely rolling tables but carrying two forty pound tables before the aneurysm ruptured. Dr. Kobrine's opinion that the rupture and physical strain of the work were causally related, in contrast, "was well-reasoned, cogent, and more reasonable under the facts of this case." The examiner also pointed to Dr. Jenkins' admission that he deferred to neurosurgeons for definitive treatment of aneurysms.

Upon petitioner's administrative appeal from the examiner's findings, the Director of DOES failed to issue a decision within forty-five days as required by D.C.Code § 36–322(b)(2) (1988). The examiner's order thus became final for purposes of review by this court.

## III.

■ The District of Columbia Workers' Compensation Act of 1979, D.C.Code §§ 36–301 to –345 (1988) (the 1979 Act), defines a compensable injury as an "accidental injury ... arising out of and in the course of employment...." § 36–301(12). As these words indicate, a compensable claim embodies three elements: the injury must (1) be an "accidental injury" (2) that "arises out of" employment and also (3) arises "in the course of" employment. *Jones v. District of Columbia Dep't of Employment Servs.*, 519 A.2d 704, 707 (D.C.1987). There is no dispute that claimant's injury occurred "in the course of" his employment. Hilton's first and principal contention relates to the "arising out of" element. For an injury to have "arisen out" of the employment, DOES has re-

quired evidence that "the obligations or conditions of employment ... exposed the employee to the risk or dangers connected with the injury." *Grayson v. Washington Metro. Area Transit Auth.*, H & AS No. 83–2609, DOES Final Order at 7 (May 24, 1985), *aff'd sub nom. Grayson v. District of Columbia Dep't of Employment Servs.*, 516 A.2d 909 (D.C.1986). In affirming the *Grayson* decision, this court noted that "[t]he standard used by the Director in this case is a liberal one and furthers the purpose of workers' compensation, which is to provide financial and medical benefits to employees injured in work-related accidents." *Id.* at 912 (citation omitted). The standard "also accords with the general policy that workers' compensation statutes should be liberally construed." *Id.*

Notwithstanding this general rule of causation, in 1984, the Director adopted a special standard applicable to claimants who had a preexisting arteriosclerotic condition at the time of the injury. The Director concluded that where an employee suffers a myocardial infarction (a heart attack) and there is proof of a preexisting arteriosclerotic condition, the claimant must offer proof that the heart attack was precipitated by exertion which was unusual for the injured employee. *Rose v. George Hyman Constr. Co.*, H & AS No. 83–226 (Aug. 27, 1984), *aff'd, George Hyman Constr. Co. v. District of Columbia Dep't of Employment Servs.*, 497 A.2d 103 (D.C.1985) (affirmed without reaching propriety of "unusual exertion" test). On three occasions, we have reserved judgment on whether this rule comports with the statutory framework.[7] Petitioner contends that the hearing examiner in this case failed to apply the "unusual exertion" test of *Rose* without explanation.[8] Claimant in turn

7. *Jones v. District of Columbia Dep't of Employment Servs.*, 519 A.2d 704, 709 (D.C.1987); *Washington Metro. Area Transit Auth. v. District of Columbia Dep't of Employment Servs.*, 506 A.2d 1127, 1130 n. 5 (D.C.1986); *George Hyman Constr. Co. v. District of Columbia Dep't of Employment Servs., supra*, 497 A.2d at 106 n. 2.

8. There is an argument to be made that the *Rose* requirement of an unusual exertion was intended by the Director to apply only to a "general-

ized" internal failure such as a heart attack and not necessarily to the "breaking" that occurs when an aneurysm ruptures—the latter not requiring proof of an unusual exertion. *Compare* 1B A. LARSON, THE LAW OF WORKMEN'S COMPENSATION §§ 38.23 *with id.* § 38.30 (1987). The hearing examiner in this case, however, relied on no such distinction and claimant does not argue for it in defending the examiner's ruling. Professor Larson has criticized the distinction as

does not contend that the examiner applied the standard of *Rose;* he maintains instead that *Rose* is contrary to the compensation statute as interpreted in this jurisdiction, and that its test should be rejected. Claimant argues in the alternative that this court should apply the modified standard subsequently adopted by the Director in *Trilling v. Washington Metro. Area Transit Auth.,* H & AS No. 86–449 (Sept. 16, 1988), in which the Director substantially altered the *Rose* standard and ruled that an employee with a preexisting arteriosclerotic condition can meet the "unusual exertion" test merely by proving jobrelated stress that is unusual compared to other occupations or to his daily life; he need not show a job stress unusual for him. Petitioner Hilton responds that to apply the standard of *Trilling* retroactively (that test having been adopted almost six months after the compensation order here) would be unfair and contrary to the retroactivity analysis employed by this court, in *Reichley v. District of Columbia Dep't of Employment Servs.,* 531 A.2d 244 (D.C.1987). Petitioner maintains as well that the *Trilling* standard is inferior on its merits to that of *Rose.*

We conclude that it is unnecessary for us to enter the debate over whether *Trilling* should be applied retroactively. We also conclude that it is unnecessary (and, indeed, inappropriate in view of the Director's subsequent retreat from *Rose* ) for us to consider whether the unusual exertion standard of *Rose* would comport with the statute in all of its applications. In particular, we need not decide whether *Rose* could validly be applied to job activi-

ties that are more sedentary and less inherently stressful than those performed by claimant, or to circumstances in which the claimant was not engaged in those activities at or near the time of his injury. We hold instead that the unusual exertion requirement cannot, consistent with the statute as construed in this jurisdiction, be applied in the circumstances of this case, where claimant was engaged in job-related activities both stressful in themselves and made more so by the immediate circumstances, and was engaged in that work at or near the time of his injury.

To recapitulate, it is undisputed that:

(a) Davila's regular duties included carrying and setting up tables and platform sections forty or more pounds in weight and up to eight feet in length;

(b) his injury occurred during the busy time of year, and during the busiest hours of the day when the crew might be required to "turn over" a room in five or ten minutes;

(c) without apparent disapproval by the employer, Davila customarily worked faster than anyone else, carrying two tables at a time and a single platform section by himself;

(d) he was carrying two forty pound tables by himself, if not at the moment he collapsed, then within minutes before.

In addition to this, the examiner found that claimant was working even faster than usual at the time of the injury because the work crew was short-handed, a finding for which there is substantial support in the record.[9] We need not consider whether

---

artificial from a medical standpoint and impractical to apply. *Id.* § 38.73.

**9.** Claimant's coworker Carlos Velasquez testified in a manner supporting the inference that claimant's crew was short-handed at the time of the injury, and that consequently the crew was forced to work faster than usual. It is true, as petitioner points out, that on initial cross-examination Velasquez answered affirmatively the question whether claimant "didn't have to move any faster on the day of the injury than he did any other time." On redirect examination, however, Velasquez maintained that during a fast "turnover" of a room by a short-handed crew, the men had to work faster than normal, including Davila. On recross-examination, Velasquez

confirmed that on April 24, 1985, the crew was short by two to four men; he rejected the suggestion that this was always the case—that the other men were simply working in another room—pointing out that when the crew had a "faster turnover," they always worked together "to make it quickly, maybe five or ten minutes." He acknowledged that it was not unusual for Davila to be working with only three other employees when turning over a room, explaining that "[w]e do it every month, every couple of weeks." Velasquez's testimony, in sum, although not perfectly consistent, supports the inference that at the time of the injury Davila was working faster than his daily practice required. Counsel for the employer were content

that finding of additional stress would be sufficient by itself to meet the *Rose* unusual exertion standard.[10] It is enough that, as we now show, under all the circumstances in which claimant's injury occurred, the statute could not faithfully be construed to bar Davila's claim for compensation merely because he could prove no "unusual exertion" as understood by *Rose.*

## IV.

The Director in *Rose* was well aware that he was adopting a rule in apparent conflict with case law interpreting the identical "arising out of" phrase of the predecessor to the 1979 Act, the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901–950 (1982), as extended by Congress to District of Columbia private sector workers, D.C.Code §§ 36–301 to –345 (1973). In *Wheatley v. Adler,* 132 U.S.App. D.C. 177, 407 F.2d 307 (1968) (en banc), the United States Court of Appeals for the District of Columbia Circuit synthesized and applied decisions of that court construing the same phrase in a case involving a worker with a preexisting arteriosclerotic heart disease. Very much unlike claimant Davila, the employee in *Wheatley,* after punching in, had been engaged merely in urinating out of doors in cold weather when he suffered a heart attack. Nevertheless, the court of appeals reversed an order denying compensation. After citing the general rule that activity of this sort is deemed to arise within the course of employment, and noting that there was no

evidence that the employer had forbidden resort to these "ad hoc facilities," [11] the court rejected the point that Wheatley had failed to show any unusual exertion:

> It would not defeat compensation even if the act of urinating, in cold weather out of doors, is taken as not involving an unusual strain. The law in this jurisdiction does not require any unusual stress, and contemplates awards so long as the death or injury results from activity in the course of employment. It makes no difference that the decedent was exposed to no more than the ordinary hazards of living and working, or that the same kind of injury might have occurred wherever he might have been.

*Id.* at 181, 407 F.2d at 311 (citation omitted). The court quoted from its previous decision in *Commercial Casualty Ins. Co. v. Hoage,* 64 App.D.C. 158, 159, 75 F.2d 677, 678, *cert. denied,* 295 U.S. 733, 55 S.Ct. 645, 79 L.Ed. 1682 (1935), as follows:

> It has been held a number of times, and we think correctly, that an accidental injury may occur notwithstanding the injured is then engaged in his usual and ordinary work, and likewise that the injury need not be external. It is enough if something unexpectedly goes wrong within the human frame.

*Wheatley, supra,* 132 U.S.App.D.C. at 181 n. 6, 407 F.2d at 311 n. 6. The court acknowledged that Wheatley had had a preexisting arteriosclerotic condition, but pointed out that "it is settled that an ag-

---

to leave the record in a state that permitted this inference, though it did not compel it.

**10.** Although claimant made this contention at the very end of his post-hearing brief before the hearing examiner, he does not renew it in this court. Moreover, although the examiner, in accepting Dr. Kobrine's expert opinion over that of Dr. Jenkins, pointed out that Dr. Jenkins had "disregarded the fact that the claimant was working at a faster pace than normal due to a shortage of manpower," we cannot be certain that with this observation the examiner meant to say the *Rose* requirement was satisfied. The examiner did not cite *Rose,* and his ruling rested primarily on acceptance of Dr. Kobrine's opinion that claimant's work activity was "the direct precipitating cause" of his aneurysmal rupture. Dr. Kobrine's opinion, however, did not rest on

the hypothesis that claimant was working faster than "normal" during the busy lunch hours at the time of his injury. While Dr. Kobrine knew the general nature of the work claimant was doing, in forming his opinion he was not aware of any exceptional stress that claimant was under on the day of the injury.

**11.** Just as "the employer did not show that he had forbidden Wheatley's use of the informal [outdoor] facilities," 132 U.S.App.D.C. at 181, 407 F.2d at 311, so, by somewhat distant analogy, it may be noted that the employer in this case did not show that it disapproved of Davila's regular practice of working faster than anyone else. As Davila testified without contradiction, "Because they knew that I would do anything, they were giving me more and more and more work there."

gravation of a preexisting condition may constitute a compensable accidental injury under the Act." *Id.* at 182, 407 F.2d at 312 (citation and footnote omitted). The appended footnote read:

"Thus the cases almost invariably decide that the fact that the injury would not have resulted but for the pre-existing disease, or might just as well have been caused by a similar strain at home or at recreation, are both immaterial." H. McNiece, Heart Disease and the Law 12 (1961). *See also id.* at 57–59.

*Id.* at 182 n. 11, 407 F.2d at 312 n. 11.

In *Rose*, the Director took issue with the decision in *Wheatley*, noting that its language "went far beyond the ordinary exertion rule established in *Commercial Casualty*." *Rose, supra*, DOES Final Order at 5. Moreover, on the basis of testimony by two medical experts in *Rose*, and of a 1933 decision of the Maryland Court of Appeals,[12] the Director concluded that whatever the medical consensus had been at the time of *Wheatley*, "[g]iven the current status of medical thinking," a heart attack "is not viewed by medical practitioners as being caused by work activity in the absence of some unusual or extraordinary physical activity or stress." *Id.* at 8. With very little more analysis than this, the Director effectively banished *Wheatley* to the library of medical-legal history.

This court, however, has not dismissed *Wheatley* as an anachronism. On the contrary, we have repeatedly considered it to have supplied an authoritative statement of the meaning of a compensable accidental injury in this jurisdiction, under both the Longshore Act and the 1979 Act. For example, in *Washington Metro. Area Transit Auth. v. District of Columbia Dep't of Employment Servs.*, 506 A.2d 1127 (D.C. 1986) (per curiam) (*WMATA*), the court rejected an employer's contention that the statutory term "accidental injury" requires proof of an unusual occurrence. We sustained the Director's interpretation, relying on *Wheatley*—and at least as to non-heart related injuries—that a claimant need prove "only that something unexpectedly

went wrong within the human frame." *Id.* at 1128. We pointed out that, in enacting the 1979 Act, the Council of the District of Columbia had not changed the language of the Longshore Act regarding "accidental injury" and had expressed no dissatisfaction with judicial interpretation of that phrase. "This course of action," we said, "leads us to conclude that the Council was satisfied with the interpretation the courts had placed on those words." *Id.* at 1129.

Similarly, in *Jones v. District of Columbia Dep't of Employment Servs., supra* note 7, we relied on *WMATA* and a previous circuit court decision "dealing with a definition of compensable injury [in the Longshore Act] identical to the [1979] statute," to reject a requirement "that an unusual incident be the cause of the injury" in the case of injuries attributable to emotional stress. 519 A.2d at 708, *citing, inter alia, Hoage v. Royal Indemnity Co.*, 67 App.D.C. 142, 145, 90 F.2d 387, 390, *cert. denied*, 302 U.S. 736, 58 S.Ct. 122, 82 L.Ed. 569 (1937). And in *Ferreira v. District of Columbia Dep't of Employment Servs.*, 531 A.2d 651 (D.C.1987), involving a claimant with a preexisting spinal impairment, we again rejected the notion that, to establish an accidental injury, a "specific traumatic injury" or unusual incident must be the cause of a claimant's disability. We cited *Jones, WMATA, Wheatley* and *Commercial Casualty*, among other decisions, as holding that it is enough "if something unexpectedly goes wrong within the human frame." *Id.* at 656. We acknowledged the elusiveness of that standard, but pointed out that it at least meant that the precipitating event could occur in the "usual and ordinary" course of work. *Id., quoting Commercial Casualty, supra*, 64 U.S.App. D.C. at 159, 75 F.2d at 678. On remand to the Director, we further directed DOES' attention to "this jurisdiction's 'aggravation rule' of compensable accidental injuries," quoting the definition of the rule in *Wheatley*, and pointing to the premise of the rule that "[e]mployers must 'accept with their employees the frailties that predispose them to bodily hurt.' " *Id.* at 660,

**12.** *Schemmel v. T.B. Gatch & Sons Contracting* & *Bldg. Co.*, 164 Md. 671, 166 A. 39 (1933).

*quoting J.V. Vozzolo, Inc. v. Britton*, 126 U.S.App.D.C. 259, 262–63, 377 F.2d 144, 147–48 (1967).

Unlike *Wheatley*, none of our own decisions just discussed involved claimants with preexisting heart or vascular illnesses. Nor did these decisions—again unlike *Wheatley*—deal specifically with the meaning of the "arising out of" element of a compensable claim. It is readily apparent from the decisions, however, that the elements of "arising out of" and "accidental injury" are conceptually similar to the extent that both entail inquiry into causation. *See* part V, *infra*.[13] Thus, our repeated citation to *Wheatley* as setting forth the basic elements of a compensable injury claim, and specifically as rejecting any requirement of an unusual incident or stress as cause of the injury, is powerful indication of our sense that the unusual exertion test of *Rose* is at odds with the statutory test for causation.

As in the case of the accidental injury concept discussed in *WMATA*, we can find nothing in the legislative history of the 1979 Act evincing any dissatisfaction by the District of Columbia Council with the "arising out of" standard as articulated in *Wheatley*, whether applied to preexisting cardiovascular disorders or to any others. Although the Council, in passing the 1979 Act, was indeed intent on narrowing coverage and compensation in comparison to the

Longshore Act, nothing in the legislative materials indicates that the breadth of the causation standard was its concern.[14] We have relied several times on the principle that "[w]hen a local provision is borrowed directly from a federal statute, the Council is presumed to have borrowed the judicial construction thereof as well." *WMATA, supra*, 506 A.2d at 1129; *Hughes, supra* note 14, 498 A.2d at 571 n. 8, *citing Whitt v. District of Columbia*, 413 A.2d 1301, 1303–04 (D.C.1980); *see also Meiggs v. Associated Builders, Inc.*, 545 A.2d 631, 635 (D.C.1988); *Lenaerts v. District of Columbia Dep't of Employment Servs.*, 545 A.2d 1234, 1237 & n. 8 (D.C.1988). Applying this rule, it is exceedingly difficult to say that the Director acted within his authority in imposing the very requirement of an unusual exertion in cases of prior heart or vascular illness that the court had found contrary to the Longshore Act in *Wheatley*. The upshot of our cases appears to be that *Rose* was an improper attempt by the Director to amend the statute.[15]

As explained earlier, however, we need not decide whether *Rose*—even if DOES still adhered to it—would be invalid in every application. Of concern to the Director in *Rose* was that in *Wheatley* the D.C. Circuit court had gone "far beyond" even the "ordinary exertion" rule of *Commercial Casualty, supra*, by permitting compensation for a heart attack suffered while

13. In *Jones, supra*, we recognized the ease with which the two elements can be confused, 519 A.2d at 707–08 (Director unpersuasively had characterized issue as "accidental injury" when cause of heart attack is mental or emotional, but—in *Rose*—as one of "causation" when cause is physical exertion). Professor Larson has noted that, at least in cases construing the relationship between preexisting heart or vascular disorder and work-related injury, "the accident and causal concepts are in many ways so commingled that it is impossible to segregate them." 1B A. LARSON, *supra*, § 38.82.

14. As the court has previously pointed out, what concerned the Council was principally the fact that the maximum benefits available in the District of Columbia were significantly higher under the Longshore Act than under corresponding statutes in Maryland and Virginia, *Lee v. District of Columbia Dep't of Employment Servs.*,

509 A.2d 100, 104 (D.C.1986), as well as the broad extraterritorial coverage the act had permitted for employees with only the most tenuous connection to the District. *Hughes v. District of Columbia Dep't of Employment Servs.*, 498 A.2d 567, 569–70 (D.C.1985). *See also Railco Multi-Construction Co. v. Gardner*, 564 A.2d 1167, 1170–71 (D.C.1989). Nowhere in the legislative reports did Council members cite to the laws of Maryland or Virginia to suggest that the District's "arising out of" standard had been too liberally construed. *See* REPORT OF THE COUNCIL OF THE DISTRICT OF COLUMBIA COMMITTEE ON HOUSING AND ECONOMIC DEVELOPMENT ON BILL 3–106 (January 29, 1980); REPORT OF THE COUNCIL OF THE DISTRICT OF COLUMBIA COMMITTEE ON PUBLIC SERVICES AND CONSUMER AFFAIRS ON BILL 3–106 (January 16, 1980).

15. Indeed, in *Trilling, supra*, the Director remarked that the unusual exertion test of *Rose* "has probably been overturned by [*WMATA* and *Jones* ]." *Trilling, supra*, DOES Final Order at 4.

the employee was urinating outdoors, "regardless of whether the employee experienced *any* stress or exertion." *Rose, supra,* DOES Final Order at 5 (emphasis added); *see also Wheatley, supra,* 132 U.S. App.D.C. at 185 n. 3, 407 F.2d at 315 n. 3 (Danaher, J., concurring in the result) (cases cited by majority distinguishable since "each involved some clearly job-related physical exertion which served as a causal factor"); *id.* at 186–87, 407 F.2d at 316–17 (Prettyman, J., dissenting) ("no heavy work, no strain"; in "carr[ying] the *non-employment* activity concept into the heart disease area," court has "wipe[d] out a statutory phrase") (emphasis added). In the present case, by contrast, the undisputed evidence was that claimant Davila was engaged in physically demanding work, under conditions of particular stress, at or near the time he sustained his injury. We hold that whether or not that exertion was unusual for him, as *Rose* would require, is immaterial under the statute. So long as a causal connection existed between claimant's work-related activity and his injury, as Dr. Kobrine testified it did, the fact that he suffered from a preexisting arterial disorder could not serve to require him to prove an unusual exertion.

### V.

■ Petitioner's second contention is that the hearing examiner failed to resolve the issue of whether an "accidental injury" had occurred by making no finding as to whether the rupture of claimant's aneurysm was "unexpected". *See Ferreira, supra,* 531 A.2d at 656 (injury is accidental under the statute "if something *unexpectedly* goes wrong within the human frame"). Petitioner does not argue that claimant had previously been diagnosed as having an aneurysm or that he had been put on notice in any way that continued physical stress could endanger his health. Instead, petitioner points to Dr. Jenkins' testimony that claimant's aneurysm, as measured by its size and the thinness of its walls, had reached the point where rupture was inevitable within hours or "tens of

hours" regardless of his level of exertion, a conclusion fortified by the fact that claimant had suffered a sentinel bleed only days or weeks before. Petitioner argues that Dr. Kobrine corroborated this testimony by agreeing that claimant's aneurysm was large; that as an aneurysm enlarges its walls grow thinner; that aneurysms can burst even when a person is doing nothing; and that the risk of rupture is heightened when a person has had a sentinel bleed. In the face of this evidence that claimant's injury happened, in Professor Larson's words, "by the inexorable march of the disease" [16] and hence was not accidental, petitioner insists that the examiner was required to make findings as to the probability that the aneurysm would have burst regardless of claimant's activities and on the "central" issue of whether a sentinel bleed had occurred.

■ We conclude, however, that by crediting Dr. Kobrine's opinion that claimant's job activity was the direct precipitating cause of the rupture, the hearing examiner necessarily rejected Dr. Jenkins' opinion that claimant's injury stemmed solely from natural causes and that any employment connection was fortuitous. We also conclude that there is substantial evidence in the record to support the examiner's decision.

As related earlier, Dr. Jenkins concluded from the progression of claimant's aneurysm (it was "moderately big" and its walls had presumably reached a state of critical thinness) that it could just as easily have burst while claimant was at home that evening watching television as during his work activity. In considerable part, however, Dr. Jenkins' opinion argued backwards from the fact that the aneurysm had burst to its cause, for the broader basis of his opinion was that the level of bodily activity and blood pressure do not correlate with aneurysmal ruptures; in statistical samplings, an equal number of aneurysms will burst during exertion and inactivity. Dr. Jenkins, therefore, could find no causal relation between claimant's work and his rupture; the only cause he could assign to it

---

16.  1B A. Larson, *supra,* § 38.83(h).

was the natural progression of the aneurysm itself: it burst "because it was ready to."

■ This conclusion required the hearing examiner to disregard not just the nature of claimant's work and the circumstances under which he was performing it when injured; it also required rejection of Dr. Kobrine's opinion that the experience of every neurosurgeon familiar with aneurysms would confirm a causal connection between physical activity, blood pressure, and rupture of aneurysms.[17] Moreover, it discounted the corroborative force of Dr. Jenkins' own admission that "in certain specific instances" (which did not differ greatly from claimant's work activities) increased blood pressure can correlate with rupture of aneurysms. In short, the hearing examiner had adequate reason to reject Dr. Jenkins' opinion that claimant's aneurysm had not ruptured by accident because rupture was "imminent". The foundation of that opinion was Dr. Jenkins' refusal to admit a correlation which, on the expert testimony before him, the examiner could reasonably accept.[18]

■ In its reply brief, petitioner recognizes that, in regard to the "arising out of" element of a compensable injury, this court has affirmed the principle that if a disability "arose *even in part* out of and in the course of [the claimant's] employment, compensation is appropriate." *Ferreira, supra,* 531 A.2d at 660, *quoting Hensley v. Washington Metro. Area Transit Auth.,* 210 U.S.App.D.C. 151, 155, 655 F.2d 264, 268 (1981) (emphasis in *Hensley;* internal quotation marks omitted). Petitioner points us to the fact, however, that with respect to the "accidental injury" element, the Director of DOES has lately developed a more sophisticated balancing test of causation designed specifically to deal with the troublesome relationship between preexisting illness and job-related injury. In general, under that test, "If ... the involvement of the preexisting illness outweighs the involvement of the employment, then the injury may be said to be the expected consequence of the preexisting condition and not an accidental injury under the Act." *Chaney v. Southeastern Univ.,* H & AS No. 84–350, DOES Final Order at 12 (April 9, 1986). This inquiry in turn calls for consideration of multiple factors.[19] We

17. The fact that Dr. Kobrine conceded that aneurysms also rupture under circumstances of no exertion did not weaken his conclusion that physical exertion can elevate blood pressure and so heighten the risk of a rupture. Thus, contrary to petitioner's argument, the examiner's failure to note "the medical testimony of both experts that ruptured aneurysms commonly occur in patients at rest" is without significance.

18. The hearing examiner also did not err in failing to resolve whether claimant had suffered a sentinel bleed sometime before the rupture. That issue, we conclude, although contested below, ultimately was not a material one on which the examiner was compelled to make a finding. *See Davis v. District of Columbia Dep't of Employment Servs.,* 542 A.2d 815, 819–20 (D.C. 1988) (agency required to make findings on all *material,* contested issues of fact). As noted previously, there is no contention here that the occurrence of a sentinel bleed should have forewarned claimant about the risks of continued employment. Furthermore, Dr. Kobrine's opinion assumed for the sake of argument that a sentinel bleed had occurred (although he could not be medically certain there had been one); in his view, the occurrence of a sentinel bleed would have been even greater reason why subsequent stressful activity increased the danger

of an aneurysmal rupture. Dr. Jenkins' opinion likewise, though for the opposite reason, did not turn on whether claimant's aneurysm had bled previously; in his view, it was destined to rupture in a matter of hours whether or not there had been a sentinel bleed. In sum, whether or not a sentinel bleed had occurred was not an issue the hearing examiner was required to resolve in deciding which expert's opinion to accept.

19. The Director borrowed a standard which this court had fashioned in *Stoner v. D.C. Police & Firemen's Retirement & Relief Board,* 368 A.2d 524, 531 (D.C.1977), for deciding whether there had been sufficient aggravation of a preexisting psychological disorder to permit pension relief under then D.C.Code § 4–527 (1975 Supp.):

[T]he appropriate inquiry includes consideration of (1) the nature and degree of abnormality of the underlying psychological characteristics, (2) the likelihood that the disabling manifestations of such characteristics would have appeared despite the particular trauma or circumstances under consideration, and (3) whether there had been any previous indication that the disability (as distinct from the mere potential therefor) had begun to manifest itself as a result of circumstances external to the officer's service.

conclude, however, that we have no occasion to consider in this case whether the *Chaney* test is a permissible gloss on the statutory term "accidental injury," or what result it would dictate in this case. First, although the issue of accidental injury was plainly contested before the hearing examiner, petitioner did not ask the examiner to apply the *Chaney* test (nor did it cite the test to the Director in requesting a stay of the examiner's compensation order). Moreover, the examiner could not be expected to consider application of *Chaney sua sponte.* So far as we can determine, the Director so far has applied *Chaney's* balancing test only to cases involving psychological stress-related injuries and injuries stemming from "labile physical diseases" such as hypertension. *See Chaney, supra,* DOES Final Order at 10; *Searles v. Safeway Stores, Inc.,* H & AS No. 84–288 (April 14, 1986). Claimant's injury was of neither kind, and we have no way of discerning whether the Director would apply the *Chaney* test, or a variant of it, in the case of a preexisting vascular illness.

We of course do not foreclose, or discourage, efforts by the Director to give additional content to a definition of accidental injury ("something unexpectedly goes wrong within the human frame") which has proven "undeniably elusive" even outside the problematical context of preexisting cardiovascular illnesses. *Ferreira, supra,* 531 A.2d at 656. We hold in this case, however, that given the nature and circumstances of the work claimant was performing when injured, claimant met his burden of proving an accidental injury within the meaning of the Act.

## VI.

The order awarding workers' compensation is

*Affirmed.*